RECOMMENDATION FROM MEDIATION:

| | |
|---|---|
| LOUDOUN COUNTY PUBLIC SCHOOLS, *Employer*, | ) ) ) ) ) ) ) ) ) ) |

LOUDOUN COUNTY PUBLIC
SCHOOLS,
*Employer*,

        v.

BRIAN B. DAY,
*Employee.*

    Case No. 20223000476

    Date: November 3, 2023

    Hon. William T. Newman Jr.

## HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION

Brian B. Day ("Day"), a physical education teacher and football coach at Independence High School, filed a timely appeal of the Superintendent's recommendation for his dismissal from employment. The undersigned, Hon. William T. Newman, Jr., was appointed by the Loudoun County School Board ("School Board" or "LCPS") to preside over a hearing in this matter pursuant to Loudoun County Public School Board Policy § 7-4, Procedure for Adjusting Grievances, Virginia Code § 22.1-308, and Virginia Administrative Code 8VAC20-90-30.

The hearing commenced on October 19, 2023, at 21000 Education Court, Ashburn, Virginia, 20132, and was held open for further written submission until October 27, 2023, at 5:00 p.m., at which time the hearing was over. The numbers referenced in this Letter Opinion refer to the parties' admitted exhibits.

As explained further below, the recommendation to terminate Brian D. Day's ("Day's") employment with the School Division should be sustained. As discussed below, the evidence demonstrates that Day's conduct violated Loudoun County School Board Policy ("Policy") 7014 *Environments Free From Harassment, Discrimination, and Abuse* (Ex. 1), as well as Policy 7560 *Professional Conduct* (Ex. 2), and its accompanying regulation (Ex. 2A). As such, the School Division had sufficient cause to justify the Superintendent's recommendation that Day's employment

1

LCPS 000416

with the school division be terminated.

## I.    PRELIMINARY MOTIONS ARGUED BEFORE HEARING

### A.    Plea to the Statute of Limitations

Day made a plea of the statute of limitations, arguing that there were no dates provided by LCPS on which any of the alleged conduct occurred — Day argued that having no dates, LCPS could not reasonably conclude or establish that any of the alleged conduct occurred after February 15, 2021, which is two years before the February 15, 2023, notice of proposed dismissal. The Plea was taken under advisement. The Plea to the Statute of Limitations is overruled for the following reasons and findings.

### B.    Title IX Non-Compliance

Day moved to dismiss the notice of proposed termination and for a decision in Day's favor pursuant to LCPS's grievance policy 7018 (Day Exhibit 6) due to LCPS's failure to comply with the substantial procedural requirements of policy 7018 and its applicable statutory counterparts. Pursuant to the grievance policy 7018, "the failure of the School Board…to comply with all substantial procedural requirements without just cause shall entitle the grievant, at his option…at the final step, to a decision in his favor." (Day Ex. 6). The hearing was the final step, so Day moved for a decision in his favor.

Day argued that LCPS did not provide any evidence that a Title IX investigation was completed within 30 working days (Ex. 6, p. 5), that a determination as to whether the complaint was founded or unfounded was made within 15 working days thereafter, or that Day was notified of the resolution within five working days thereafter. *Id.* No documentation was provided to Day that any Title IX investigation had occurred despite LCPS placing Day on notice of the potential violation. (Day Ex. 10).

Day argued that as there was no finding of a Title IX violation, he was entitled to a decision

2

in his favor for LCPS's failure to comply with the substantial procedural requirements of the Title IX policy. Because of the failure to substantially meet the procedural requirements concerning Title IX, LCPS was estopped from going forward on the same allegations for an independent policy 7014 violation. This motion was taken under advisement; the motion is now denied for the reasons and findings below.

**C.      Policy 7014 Non-Compliance**

Day also moved to dismiss the case for LCPS's failure to comply with its own investigative standards outlined in Policy 7014 (Day Ex. 5) regarding any investigation being completed within thirty (30) working days "or as soon as practicable" as there was no documentation provided to Day of any good cause as to why, despite Day being placed on leave on March 31, 2022, LCPS failed to complete its investigation into the allegations made against Day by April 30, 2022. (Day Ex. 9). Documentation evidenced that the investigation was not complete until July 26, 2022 (LCPS Ex. 10). The findings were relayed to Day on September 22, 2022 (Day Ex. 14), and the Notice of Proposed Dismissal signed on February 15, 2023, well outside the timeframe outlined in policy 7014. (Day Ex. 15). The motion was taken under advisement. For the reasons and findings below, this matter is now denied.

**II.  INCIDENTS OF THE HEARING**

Day asked for a rule on witnesses, which was granted.

Day also objected to introducing any hearsay testimony, as it violated his constitutionally guaranteed right to due process, specifically his right to confront witnesses against him. The hearing officer indicated he would consider this argument in the weight afforded specific testimony.

Day made a motion *in limine*, requesting that all testimony and evidence be limited to the reasons stated in the reasons for the proposed termination letter (Day Exhibit 17), which says, "allegations reported to the Department of Human Resources and Talent Development that you made

LCPS 000418

inappropriate comments of a sexual nature to multiple female students were investigated and substantiated. Your actions violated School Board Policy 7560—Professional Conduct; and Policy 7014—Environments Free from Harassment, Discrimination." This motion was granted.

## III. OBJECTION TO EXHIBITS

Day objects to the following Superintendent's Proposed Exhibits that were sent on Wednesday, October 25, 2023, for the following reasons: LCPS has submitted two exhibits that were not admitted at the hearing; documents that were not provided before the hearing, and un-redacted documents containing material the hearing officer ruled as inadmissible. Several objections are hereby overruled, while others are sustained, as delineated herein.

1. At the grievance hearing on October 19, 2023, Attorney Johnson, counsel for the Superintendent, indicated that she was moving for the admission of LCPS Exhibits 10, 19, 20, 21, 22, 23, 24, 25, and 26. The Exhibits attached to the correspondence submitted to His Honor on October 25, 2023, included LCPS Exhibits 4, 10, 16, 18, 20, 21, 23, 24, 25, 26, and 27. The Superintendent included Exhibits 4, 16, 18, and 27 in the proposed packet of exhibits, documents that were not moved for admission during the grievance hearing. This objection is overruled on the grounds that these Exhibits were admitted prior to the closing of the hearing on October 27, 2023, at 5:00 p.m.

2. Day objects to Exhibit 4, the Letter of Recommendation for K. R███, because this document was not provided in discovery to Day and was not moved into evidence during the hearing. This objection is overruled because it was admitted prior to the closing of the hearing, and the Hearing Officer finds that it is relevant.

3. Day objects to Exhibit 10, the redacted investigation report, and attachments. His Honor indicated that counsel for the Superintendent and counsel for Day should jointly review the proposed redactions to Exhibit 10. Day contends that he was not allowed to review the

4

Superintendent's Proposed Redactions before transmitting the Exhibit to His Honor. This objection is overruled.

4. Day objects that Exhibits 16 and 18 (LCPS Policies 7014 and 7560) are duplicative of Exhibits submitted by Day. LCPS carries the burden of proof; thus, repetitious evidence will favor the party bearing the burden of proof. As such, this objection is overruled.

5. Day objects to Exhibit 24, "Email and Letter in Response to Req. for Hearing and Documents." Notably, this Exhibit includes 167 pages (LCPS 00001-00167), constituting the entirety of LCPS's discovery to Day. These pages include documents that His Honor has already ruled are irrelevant, immaterial, and inadmissible, including Day's performance evaluations, employment application, and prior personnel actions. Most egregiously, Exhibit 24 contains unredacted copies of Exhibit 10 and its attachments (the investigative report). The unredacted documents represent an impermissible end-run around His Honor's ruling on Day's motion *in limine,* and the papers must be struck. Day contends that the entirety of Exhibit 24 should be excluded. This objection is sustained as to Bates pages 144-167.

6. His Honor required each side to submit their admitted Exhibits by FedEx to his residence in Arlington by close of business on Tuesday, October 24, 2023. The Superintendent did not comply with that deadline. However, the Hearing Officer finds that there was substantial compliance with orders. As such, this objection is overruled.

## IV. HEARING OFFICER'S FINDINGS OF FACT

In support of his recommendation, the Superintendent submits the following exhibits, evidence, and testimony introduced at the hearing.

### A.   Day Begins Working for LCPS.

Effective August 3, 2015, LCPS hired Day as the Varsity Head Coach of its football program at Riverside High School. *See* the School Division's proposed exhibits (hereinafter, "Exhibits") at

LCPS 000420

Ex. 24. Subsequently, on or about August 19, 2015, the School Division also hired Day to work as a Physical Education ("PE") Teacher at Riverside High School. *See* Ex. 24 at LCPS000005-LCPS000009, LCPS000076-LCPS000079. Additionally, Day served as Riverside High School's Activity Coordinator from August 31, 2015, to June 16, 2016. *See id.* Day continued working at Riverside High School through the end of the 2019-2020 school year, after which he transferred to Independence High School. *E.g.,* Ex. 24 at LCPS000063. On or about August 15, 2020, Day transferred to Independence High School, where he worked as a PE Teacher and a football coach. *See, e.g., id.* John Gabriel, Principal of Independence High School ("Gabriel"), interviewed and hired Day. *See, e.g., id.*; Hr'g. Tr. 127:15-17.

**B.    LCPS Has Implemented a Policy and Procedures That Address Reports of Suspected Child Abuse or Neglect.**

Loudoun County School Board Policy 7530 addresses School Division employees' obligations to report potential abuse or neglect of a child. *See* Post-hr'g Submissions Att. 1 (also admitted as Day's hearing exhibit 7); LCPS's Office of Student Services *Child Protective Services.*

School Board Policy 7530 provides, in part:

> *Pursuant to Va. Code § 63.2-1509 et seq., and Va. Code § 63.2-1606, any employee who, in their professional or official capacity, knows, or has reasonable suspicion that a child or student is the subject of abuse or neglect, or exploitation if a student is 18 years old or over, shall report such knowledge or reasonable suspicion immediately (i.e., as soon as possible, but not longer than 24 hours after having reason to suspect a reportable offense of child abuse or neglect) in accordance with Section A.1 of this policy.*

Att. 1.

Section A.1. of School Board Policy 7530 requires that "[a]ny teacher or other school employee who has reason to suspect abuse, neglect, or exploitation of a child or student shall immediately report it to: a. [t]he principal or designee (such as an assistant principal, counselor, social worker, etc.) or supervisor of the department, who shall make such report forthwith." Att. 1.

6

Pursuant to this policy, "[t]he initial report should be an oral report submitted directly to Child Protective Services" by calling the Loudoun County Child Protective Services ("CPS"). Att. 1.

The principal or their designee must then submit the report in writing using the LCPS online CPS reporting portal. *Id.* LCPS procedure mandates that "[n]o further investigation, regarding the alleged neglect or abuse, should be conducted by staff." Att. 2.

**C.    LCPC and CPS Have Entered an Interagency Agreement That Provides Guidelines and Protocols For Reports of Suspected Child Abuse or Neglect.**

LCPS and CPS have an interagency agreement that "provide[s] guidelines and procedures for the coordination of services in Loudoun County Child Protective Services' child abuse investigations/assessments involving children who attend Loudoun County Public School[s] and/or alleged abusers who are Loudoun County Public School[s] employees as defined [a]nd referenced in § 63.2-1511 of the Code of Virginia". Hr'g. Tr. 223:18-21; Att. 3.

The interagency agreement is entered pursuant to Va. Code § 63.2-1511(D). Att. 4.2 The interagency agreement provides that "Extensive questioning of a victim, witness, or alleged abuser should be avoided until a CPS investigator is involved." Att. 3. Additionally, the interagency agreement states that "LCPS shall report the suspected abuse/neglect immediately in order for CPS to initiate the investigation in a timely manner." *Id.* § 2. The interagency agreement also provides that "CPS shall investigate all valid reports of child abuse/neglect and determine the family's need for services." *Id.* ¶ 3. The interagency agreement permits LCPS to designate an employee from its Department of Human Resources and Talent Development ("HRTD") (formerly known as Personnel Services) "to participate in and receive information in the event of any investigation of a school employee who is alleged to have abused/neglected a child." *Id.* ¶ 3. Pursuant to the interagency agreement, CPS and the LCPS HRTD designee "will plan and implement a joint investigation." *Id.*

The interagency agreement requires that, in cases where the investigation involves a school

7

LCPS 000422

employee as the alleged abuser,

> *LCPS shall cooperate with the needs of the CPS worker, and provide the following resources, as appropriate:*
> *1. Room/private space for interviews of staff and children.*
> *2. Accompaniment of the CPS worker to the site of the alleged abuse.*
> *3. Pertinent policies, procedures and records.*
> *4. Names, functions, and roles of involved parties.*
> *5. Work schedules of staff[.]*
> *6. Pertinent directory information[.]*

Att. 3 "Responsibilities of Loudoun County Public Schools" § B.

The interagency agreement requires CPS and the LCPS HRTD designee to interview any employees reported as an alleged abuser "according to a plan developed jointly." *Id.* "Responsibilities of Loudoun County Public Schools" § D.

Moreover, the interagency agreement states that the CPS worker and the LCPS HRTD designee "shall interview collateral witnesses, as appropriate to a plan developed jointly and this [agreement]. If there is an apparent conflict of interest, the CPS worker shall use discretion regarding who is to be present in the interview." *Id.* "Responsibilities of Loudoun County Public Schools" § G.

The interagency agreement states, "Nothing contained herein shall be deemed to prevent LCPS from conducting its own investigation of any employee misconduct in the event that LCPS and CPS cannot agree on the planning or conducting of a joint investigation." *Id.* "Responsibilities of Loudoun County Public Schools" § O.

The interagency agreement requires that "[i]nformation [] be shared between the CPS Unit and LCPS that is complete, timely, and pertinent so as to ensure the accuracy of the determination of the disposition of the complaint consistent with FERPA and the Virginia Administrative Code"; and that "[a]ll information gathered as a result of a child abuse or neglect investigation or family assessment shall be treated confidentially, per Family Services and Education requirements and Virginia Code § 63.2-105 and the Virginia Administrative Code." Att. 3

**LCPS 000423**

"Information Sharing and Confidentiality" §§ A, E.

**D.    Two Students Report to the School Counseling Office That Beginning in the 2020-2021 School Year, When He Had Transferred to Independence, Day Had Made Several Comments and Remarks of a Sexual Nature.**

On March 31, 2022, two students, G███ L███ ("G███") and K███ "K██" R███ ("K██") (together, "the Students"), visited the School Counseling Office at Independence High School (Hr'g. Tr. 165:9) and met with School Counselor Laura Northart ("Northart"). *See* Hr'g. Tr. 168:4-7.

Northart knows K███, or K██, because she served as K██'s school counselor when K██ was a ninth-grade student, Hr'g. Tr. 163:16. At the time of the report, K██ was an eleventh-grade student. Hr'g. Tr. 165:9.

Northart knows G██ because, at the time of the report, N███ served as G██'s school counselor. Hr'g. Tr. 163:15.

Northart believes the Students to have never been untruthful in their discussions with her. Hr'g. Tr. 164:20 and 165:4.

Gabriel also knows the Students. Hr'g. Tr. 133:16 and Hr'g. Tr. 134:5. Gabriel knows the Students to be good students. Hr'g. Tr. 138:19-20. The Students do not have any disciplinary issues. Hr'g. Tr. 138:20-21. Gabriel wrote a letter of recommendation on G███'s behalf to a sorority to which she was pledging since matriculating to college. Hr'g. Tr. 139:2-6.

During the period at issue, the Students were football managers at Independence High School. *See* Ex. 10; Hr'g. Tr. 96:20-21 and 241:12-12–13. The Students told Northart that since Day had begun working at Independence High School, i.e., since the 2020-2021 school year, he had made inappropriate comments to them. *See* Ex. 10; Hr'g. Tr. 168:4-7.

As part of her report to Northart, G███ alleged that Day had:

    a.   commented to G███ her outfits were too skimpy (Hr'g. Tr. 201:3);

9

LCPS 000424

b.  told G█████ that guys only use her for her body (Hr'g. Tr. 201:4);
c.  implied that G█████ is a whore (Hr'g. Tr. 201:2-3); and
d.  told G█████ she has had sex with the whole football team (Hr'g. Tr. 231: 14-15; Ex. 10 at Att. B).

K█████ had reported that Day had:

a.  repeatedly called K█████ a slut and a whore (Hr'g. Tr. 197:21-22);
b.  told K█████ she is always on her knees (Hr'g. Tr. 198:1);
c.  told K█████ he was going to buy her a gift from Toys R Us for her baby shower, implying she would get pregnant while in high school (Hr'g. Tr. 198:1-3);
d.  remarked to K█████ that the only reason she would go to college is so she could "f**k around with all the D1 football athletes" (Hr'g. Tr. 198:3-4);
e.  told K█████ that if he was her age, she would be all over him and he would reject her (Hr'g. Tr. 198:4-6);
f.  told K█████ that boys would use her for her money (Hr'g. Tr. 198:13);
g.  commented to K█████ that her clothing gives the impression she is a slut (Hr'g. Tr. 305: 16; Ex. at Att. B.).

Northart is a mandatory reporter under Va. Code § 22.1-293 (attached as Att. 5). Hr'g. Tr. 163:1-8. As such, and according to Va. Code §§ 22.1-293 and 63.2-1509 along with School Board Policy 7530, Northart, "in place of said report, immediately notif[ied] the person in charge of the institution or department, or his designee, who shall make such report forthwith." Hr'g. Tr. 172:5-7. Va. Code § 63.2-1509(A).

Consistent with LCPS procedure, Northart did not initiate her own investigation into the Students' reports. *Compare* Hr'g. Tr. 186: 9-11 *with* Att. 2. Per Va. Code § 63.2-1509(A), Northart notified Jaclyn Smith ("Smith"), the Independence High School Director of School Counseling. Hr'g. Tr. 169:1. Smith serves as one of Gabriel's Va. Code § 63.2-1509 designees. *See* Hr'g. Tr. 130:20-22).

Northart provided the Students with blank forms so they could each write a statement describing the matters they wished to report. Hr'g. Tr. 174:4-5. On the form provided to K█████, which she dated March 31, 2022 (Ex. 10 at Att. A), K█████ stated, inter alia:

a.  in response to "Date of Incident," "ongoing for the past two years." Ex. 10 at Att. A.

10

LCPS 000425

b.   in response to "Please write your detailed account of the incident,"

For the past two years, there has been an ongoing of stuff said to me from Coach Day about being a slut/whore. He's said that I am always on my knees, that he going [sic] to buy me a gift from toy r us [sic] for my baby shower (that would happen in high school) said [sic] the only reason I'll go to college is to fuck around with all the D1 football athletes. Said that if he was our age we would be all over him and he would reject us … These comments said to m made me believe and accept it. But these comments shouldn't be said around the school. It's not creating the environment that I want to go here.
. . .

Said that the outfits I wear give the impression of being a slut.

Ex. 10 at Att. A.

On the form provided to G███, which she dated March 31, 2022 (Ex. 10 at Att.

A), G███ stated, inter alia:

a.   in response to "Date of Incident," "Continuous since he came to the school." *Id.*

b.   In response to "Please write your detailed account of the incident,"

He said inappropriate things when we're alone walking to the field, getting equipment for football, in the hallways, etc. It's been going on since he came to the school two years ago. Some things he's said are that I'll never get a boyfriend because I've been around too much, comments about outfits being skimpy, said guys only use me for my body, and many more. The comments he makes it makes me feel like he's implying that I'm a whore and that's not the best feeling. Most of the comments that he's made happened when I was alone with him so unfortunately there's no one else to back me up other than K███ but this isn't something I would ever lie about and take it seriously. Over the year I just started to accept it because I didn't think I had enough proof for anything to be done. One of my bigger concerns is that he may say stuff to other girls in is class or potential new managers. He's also made multiple comments about me having sex with the whole football team (when I never did. [sic.]" Ex. 10 at Att. A.

Each Student statement identifies the school administrator responsible for taking the reports as Kelly James, an assistant principal at Independence High School. *See* Ex. 10 at Att. A; Hr'g. Tr. 175:10-16.

Northart did not direct the Students on what to write other than to tell them to be as detailed

LCPS 000426

as possible. Hr'g. Tr. 174: 17-19. The Students wrote their own statements. Hr'g. Tr. 176: 1-4; Ex. 10 at Att. A. Northart sat with Smith while she contacted the CPS to make referrals relative to each of the Student's reports. Hr'g. Tr. 172: 14-18.

She provided Smith with the information to report to CPS. *Id.*

    a.  On the written referral generated for G▮▮▮, the narrative states, in part:

G▮▮▮ reported to her school counselor and Assistant Principal that Mr. Day has said inappropriate comments to her since he joined our faculty at Independence [High School] two years ago. She says he had made the following comments: - her outfits are too skimpy – . . . implies she's a whore ........ accusations that she has had sex with the whole football team She [sic] has indicated that she feels very uncomfortable around him. Our Principal has called LCPS R, who asked us to report this to CPS and our Sheriff.

Ex. 10 at Att. B.

    b.  With regard to the referral Smith generated for K▮▮▮, the narrative states, inter alia:

K▮▮▮ reported to a school counselor and an Assistant Principal that over the past two years Mr. Day has repeatedly called her a slut and whore. In addition, K▮▮▮ reported that Mr. Day has made the following comments to her: - "I'm always on my knees" – That he's going to buy her a gift from Toys R Us for her baby shower, implying she will get pregnant in high school. – the only reason she would go to college is to "fuck around with all the D1 football athletes" – if he was our age, she would be all over him and he would reject her – . . . that the outfits she wears give the impression of being a slut She [sic] has shared that it is creating an environment at school that she does not want to go here. Our Principal called LCPS HR and they directed us to call CPS and inform our Sheriff.

Ex. 10 at Att. B.

Northart sat with Smith while she prepared and submitted the written referrals to CPS. *Id.* 172:3-173:5. Additionally, Gabriel was aware of the Students' reports against Day because he was in the main office when the Students made their reports. *See* Hr'g. Tr. 130:1-2.

**E.**    **LCPS Conducts Its Investigation into the Students' Reports About Day.**

Pursuant to School Board Policy, on March 31, 2023, Gabriel notified HRTD about the CPS referrals filed on the Students' behalf. Ex. 10; Hr'g. Tr. 218:5-8. HRTD placed Day on

12

LCPS 000427

paid administrative leave, effective March 31, 2022.

HRTD assigned Angela Wiley ("Wiley") to investigate the Students' reports on behalf of the School Division. *See* Ex. 10; Hr'g. Tr. 217:17. On April 5, 2023, a CPS investigator, along with Wiley, interviewed each of the Students separately with their respective parents present. *See* Ex. 10; Hr'g. Tr. 240:17-21 and 245:13-16.

During K█████'s interview, she stated:

a. She had been a football team manager for the past three years. Ex. 10 at 4 (LCPS00006).
b. She and G█████ manage the varsity team. *Id.*
c. She and G█████ also oversee the junior varsity football team managers. *Id.*
d. The football managers work independently with each of the football coaches at Independence High School. *Id.*
e. K███ met Day during the 2020-2021 school year. *Id.*
f. Due to pandemic-related concerns and restrictions, the football season did not commence until January 2021. Ex. 10 at 4 (LCPS00006).
g. School operations had been mostly virtual because of the COVID-19 pandemic. *Id.*
h. As students began attending school in-person more frequently, K████ interacted with Day. *Id.*
i. Upon the start of the 2020-2021 football season in January 2021, K████ interacted with Day a few times daily. *Id.*
j. One to one and a half months into knowing Day, K████s interactions with him became uncomfortable. Ex. 10 at 4 (LCPS00006).
k. A majority of her interactions with Day occurred privately on the football field. *Id.*
l. Day told K████ privately:

   i. "The only reason you want to go to Ohio State is because you want to fuck all of the D1 players." Ex. 10 at 4 (LCPS00006)
   ii. Day was going to buy K████ a baby shower gift from Toys "R" Us, insinuating she was going to get pregnant in high school. *Id.*
   iii. On more than one occasion, that her outfits were slutty. *Id.*
   iv. "Oh, don't wanna bend down; your ass might show." *Id.*
   v. "You are looking kinda whorey today." Ex. 10 at 5 (LCPS00007).

m. K████ did not address or acknowledge Day's comments at the time they were made, but the comments bothered her. Ex. 10 at 5 (LCPS00007).
n. G████ witnessed some of the statements that Day had made to her. *Id.* These comments included:

13

LCPS 000428

    i.    During a conversation with G▅▅ in the 2021-2022 football season, K▅▅ told Day she was catholic and holy. *Id.* Day commented, "Of course you are holy because you love being on your knees." Ex. 10 at 5 (LCPS00007).

    ii.    On a day when K▅▅ was wearing shorts with pineapples on them, Day commented that her shorts stood for swingers and that she was going to be a swinger. *Id.*

    iii.    K▅▅ looked up what Day was talking about and when she realized what swingers were, she became uncomfortable. *Id.*

    iv.    During a conversation with K▅▅ and G▅▅, Day told them they would be all over him if he was in high school and he would have rejected them, insinuating that they were attracted to Day. *Id.*

o.    K▅▅ told some football players she was uncomfortable with some of Day's comments, but the players laughed it off and said, "That's Day being Day." Ex. 10 at 5 (LCPS00007).

p.    K▅▅ was apprehensive about reporting the behavior because she did not want the complaint to impact her ability to manage the football team or her relationships with the team and coaches. *Id.*

q.    K▅▅ trusted her instincts and reported Day's behavior to an Carnadi Ford ("Ford"), an assistant football varsity football coach at Independence High School, and to R.J. Windows ("Windows"), the head varsity football coach at Independence High School. *Id.*

r.    Ford had instructed K▅▅ to speak with Windows. *Id.*

c.    Windows listened to K▅▅ and directed her to Independence High School's counseling office and to the school administrators. *Id.*

During G▅▅'s interview, G▅▅ stated:

a.    She manages three sports: football, wrestling, and lacrosse. Ex. 10 at 5 (LCPS00007).

b.    She loves working with the teams and players. *Id.*

c.    She works mostly with the football coaches. *Id.*

d.    Most of the football coaches have been respectful and "like family" to her. *Id.*

e.    G▅▅ had been managing the football team for the past three years. Ex. 10 at 5 (LCPS00007).

f.    G▅▅ met Day during the 2020-2021 school year as a sophomore. *Id.*

g.    Day began making weird comments, but she brushed them off because the football players would say, "Oh, that's just Day being Day." *Id.*

h.    She realized Day's comments were inappropriate when she began talking to K▅▅ about some of the comments. *Id.*

i.    G▅▅ was unsure why Day would comment to her and K▅▅. *Id.*

j.    Day remarked:

    i.    to K▅▅ and G▅▅ about them having sex with the entire football team, Ex. 10 at 5 (LCPS00007);

    ii.    that G▅▅ would never get a boyfriend because she has "been

14

LCPS 000429

             around," *id.*;

    iii.    that boys would only use G██████ for her body, *id.*;

    iv.    that G██████'s outfits were inappropriate and skimpy, *id.*;

    v.    that if Day and G██████ were in high school together, she would be all over him and he would reject her, *id.*;

    vi.    on a day when G██████ and K████ had on matching pineapple shorts, that she and K████ were going to be swingers, Ex. 10 at 5 (LCPS00007).

    k.    Day's comments made her feel uncomfortable, especially because she felt Day was looking at her body. *Id.*

    l.    Day's comments made her feel that she was a whore. *Id.*

    m.    Because of Day's comments that her outfits were inappropriate and skimpy, she is now self-conscious about her clothing. *Id.*

Wiley also interviewed Ford and Windows. *See, e.g.,* Ex. 10 at 4 (LCPS0006). Ford told Wiley he had overheard Day state to K████, "If he were in school, he wouldn't touch her, but they [i.e., K████ and G██████] would be all over him." *Id.* at 5 (LCPS00007).

Ford informed Wiley that on at least two separate occasions since the beginning of the 2021-2022 school year, K████ and G██████ had confided to him about feeling uncomfortable around Day. Ex. 10 at 6 (LCPS0008). Ford told Wiley that on the last occasion, in March 2022, he suggested K████ and G██████ speak with Windows. *Id.*; Hr'g. Tr. 275: 10-15.

Windows stated he supervises Day as the physical education department chair and the head football coach and oversees the football managers. Ex. 10 at 6 (LCPS00008). Windows stated that the severity of the information reported by K████ and G██████ in March prompted him to have K████ and G██████ discuss their concerns with the Independence High School counseling office and school administrators. *Id.*

Concerning Day's own interview, Day, who had retained counsel, made several objections to the process before ultimately agreeing to submit to an interview with LCPS's investigator only. *See* Hr'g. Tr. 224:12-15; *see also, e.g.*, Att. 6.

On May 17, 2022, Wiley interviewed Day without CPS present because Day had refused to participate in any interview with CPS in attendance. *See* Ex. 10; Hr'g. Tr. 224:12-14. During the May

LCPS 000430

17, 2022 interview, Day responded to the questions set out below as follows:

    a.    Wiley: Is it something that you would typically do, and I know that you're a coach as well, so in either capacity as a teacher or as a coach would you have used inappropriate language at any time? (Att. 7 at 4:20-24 (also admitted by Day as hearing exhibit 22.))

        Day: Something I try very hard to not do. (Att. 7 at 5:1-2.)

    b.    Wiley: Okay. So then there was another allegation of inappropriate or insensitive comments to female students, specifically students that manage the football team and during that period of time when it's in between practice and school, just making insensitive comments or comments that may be perceived as inappropriate. Do you have any idea what that would be about? (*Id.* at 5:3-11.)

        Day: Not to my recollection, no. (*Id.* at 5:12.)

    c.    Day: So this is the football managers? Wiley: Correct

        Day: I'm assuming this is during football season? Wiley: Yeah.

        Day: Is that what they're saying?

        Wiley: Well, over the period of the last two years were the run of the mill type comments, during the season, outside of the season, at PE.

        Day: Um, okay.

        Wiley: During that time period. Have you ever referred to a female student as a slut or a whore?

        Day: No.

        Wiley: Along those same lines, commenting to a student that 'You're looking whorey today?'

        Day: No. '

        Wiley: No, you didn't make the statement or no, you don't have a recollection either way?

        Day: No, I don't recollect. That's not something I would say and I don't have a [re]collection of ever saying it. (*Id.* at 13:5-14:5.)

    d.    Wiley: So, there was also another report that there was a discussion about swingers and pineapple shorts, and I'm not really sure what the correlation between the two is, but they alleged that there was a conversation about swingers and pineapple shorts. Do you have any recollection of a conversation about any of that?

        Day: Well, the pineapple is a symbol of swingers, but I don't recollect necessarily a conversation about calling girls swingers.

        . . .

        Wiley: So when she wore the shorts, was there a conversation about the shorts?

        Day: Not that I remember. (Att. 7 at 14:6-23.)

    e.  Wiley: Oh, then there was another allegation or report that you spoke

16

LCPS 000431

> to a female student about her attire and her clothing being skimpy and guys using her for her body. Can you talk to me a little bit about that specific allegation?
>> Day: I cannot.
>> Wiley: You don't recall?
>> Day: I don't recall. It doesn't sound like something I would say.
> (Att. 7 at 14:24-15:9.)

f.   Wiley: Another allegation is that you made a comment that you were going to buy a student gifts from Toys "R" Us because she is going to get pregnant in high school. Do you recall having any kind of conversation like that --
>> Day: No.
>> Wiley. -- or what is your response to that allegation?
>> Day: I do not remember having any conversation like that. (Att. 7 at 16:10-20.)

Wiley asked Day about his relationship with the students and his perspective on why they would make up the allegations. Att. 7 at 17:10. Day responded that he had reported that several individuals were parking in staff-designated spots in February or March 2022, and "about a week from there, two football managers in the boys PR hallway as I said, 'Hello, how are you doing?' said 'I'm not speaking to you' and I said, 'Okay. How come?' And she said, 'You know why' which I didn't know why." Att. 7 at 18:16-20.

Day assumed this exchange was due to his complaint to the school's Safety and Security Officer, Brian Elliott ("Elliott"), that several individuals had parked in staff parking spaces. *Id.* at 18:23-19:12. Day also assumed that the reports made by the Students were retaliatory in nature because he had reported that several individuals -- some students and others who turned out to be LCPS personnel -- had parked in the spaces at issue. *Id.* at 19:13-20:8.

Day explained the Students commented how he was a "horrible leader" and "a horrible person" in response to an Instagram post he had made "about encouraging kids about being good leaders and et cetera." Att. 7 at 20:9-16. Day explained the nature of his relationship with the Students prior to and following his reports to Elliott extensively, even describing how he helped one of the Students navigate a breakup with a football player. *See* Att. 7 at 17:5-21:4.

LCPS 000432

Wiley provided Day another opportunity to provide additional information in rebuttal to the Students' reports by asking, "Anything else you can think of? Have you had any conversations with any of the other coaches about any concerns?" *Id.* at 22:1-3.

Day responded by describing interactions with two other Independence High School employees, R.J. Windows, and Matt Shannon, concerning his status. *Id.* at 22:4-18. Day did not provide additional information or context in rebuttal to the Students' reports. *See id.* Wiley also allowed Day to ask questions, to which she responded. *See id.* at 24:2-36:15.

In response to Day's inquiry into "the process from here moving forward," Att. 7 at 33:14-21, Wiley explained that the investigation could extend into the following school year because she had "to wait for CPS to close their case before [she] can even really start [her] case." *See id.* at 33:22-35:23. "Because CPS and LCPS at the time were working jointly, [Wiley] was able to kind of tag along with some of those meetings and some of those interviews," but she could not submit anything until CPS closed its investigation. *Id.* at 34:2-7. At the time, Wiley estimated that the CPS investigation could take upwards of 90 working days to complete. *Id.* at 34:8-20.

Wiley further explained:

> So I won't be able to submit my stuff until -- now my report will probably be done, but I can't submit anything until they've made a determination, then it had to go through the chains here and that could take anywhere from a week to a month, just depending on what all is going so. So, and if I'm being realistic, I wouldn't think that it would be resolved by the end of the school year.
>
>   . . .
>
> Just because I'm waiting on CPS. Att. 7 34:21-35:6, 35:8-9.

Wiley advised that the length of time to complete the investigations "really depends and then of course whatever [HRTD's] decision is, [HRTD] would communicate when [it] finish[ed], but [Day would] probably get a letter from CPS before [HRTD does] saying that [CPS had] completed [its] portion or whatnot and then [HRTD] would move forward with [its own]." *Id.* at

LCPS 000433

35:13-18.

**F.    After CPS Failed to Complete Its Investigation Into the Students' Reports For Several Months, HRTD Advances Its Own Investigation Into Whether Day Had Committed Any School Board Policy Violations.**

On July 11, 2022, sixty-six (66) days from the date CPS and Wiley jointly interviewed the Students, Wiley requested a status on the disposition of the CPS investigation. *See* Ex. 10 at Att. D; Hr'g. Tr. 236:22. The assigned investigator's "email was bumping back to" her, and CPS reassigned its case to a new investigator. *Id.* At that time (July 11, 2022), the CPS investigation was "still pending (open)." *Id.* By July 26, 2022, seventy-seven (77) workdays after CPS and Wiley jointly interviewed the students, CPS had not completed its investigation. *See* Ex. 10 at 2 (LCPS00004); Hr'g. Tr. 245:13-14.

After CPS's investigation remained open and consistent with the interagency agreement between CPS and LCPS, HRTD moved forward with its own investigation. *See* Att. 3; Hr'g. Tr. 223:19-21. Wiley interviewed Ford, Elliott, and another assistant football coach and teacher at Independence High School, Patrick Nufable, on July 14, 2022, and July 13, 2022, respectively. Ex. 10 at 4 (LCPS00006). Wiley interviewed Elliott "to verify Day's allegation." Ex. 10 at 6 (LCPS00008).

Elliott recalled to Wiley that in February 2022, Day had reported to him concerns that unauthorized vehicles were parked in staff parking spaces. *Id.* Elliott explained that through inquiry and by reviewing school surveillance video, he identified G███ as parking in the staff parking spaces. *Id.* Elliott spoke with G███ while she was in the football coach's office. Hr'g. Tr. 96: 20-22. He explained that G███ took responsibility for parking in staff parking spaces. *Id.* Elliott stated that no disciplinary action was taken against G███. *Id. See also* Hr'g. Tr. 98: 17-22.

Elliott stated that he did not disclose to G███ that Day had made the complaint about the unauthorized vehicles in staff parking spaces. *See* Ex. 10 at 6; Hr'g. Tr. 104:10-13. During the

19

LCPS 000434

hearing of this matter, an email produced by Day reflects that Day initially raised his complaint about the staff parking on February 23, 2022. *See* Att. 8 (also admitted into evidence as Day's Exhibit 19).

Day included pictures of several vehicles in the February 23, 2022, email. *Id.* Day's February 23, 2022 email does not identify any of the vehicles as belonging to any particular individual. *See id.* Nor does this email identify or mention G███ or K███. *See id.* Elliott stated he would look into the matter, Att. 8, which he did. Hr'g. Tr. 89:2-7.

Day submitted a second email on March 9, 2023. *See* Att. 9 (admitted into evidence as Day's Exhibit 20); Hr'g. Tr. 89:10. Akin to the February 25, 2022, email, Day's email of March 9, 2023, included pictures of several vehicles. Att. 9; Hr'g. Tr. 89:11-16. None of the pictures of vehicles incorporated in the February 25, 2023, vehicles were identical to those incorporated in the March 9, 2023. *See id.* Nor are any of the vehicles' license plate numbers identical. *Id.*

Elliott does not recall that K███ was one of the individuals who had parked in any of the staff parking spaces. *See* Hr'g. Tr. 93:4-8. After Elliott spoke with her, G███ was never reported for parking in staff spaces. Hr'g. Tr. 97:9-12.

**G.    Wiley Determines, Based on a Preponderance of the Evidence, Day Had Violated School Board Policies 7014 and 7560 along with Regulation 7560 and Recommends That the Superintendent Propose Day's Dismissal From Employment With LCPS.**

In considering whether it was more likely than not that Day had engaged in the conduct reported by the Students and had therefore violated School Board Policy 7014 and School Board Policy and Regulation 7560, Wiley considered the witnesses' credibility. Hr'g. Tr. 243:5-12.

In assessing the Students' credibility, she recognized the Students' statements were consistent. Hr'g. Tr. 243:5-12. On September 22, 2022, LCPS notified Day that it had completed its investigation and that HRTD had determined Day had violated School Board Policy 7014 *Environments Free from Harassment, Discrimination, and Abuse* and School Board Policy 7560 *Professional Conduct.* Day Ex. 14. The notice informed Day that "[i]nformation regarding his employment status w[ould] be

20

forthcoming." *Id.*

On February 21, 2023, the Acting Superintendent executed the Notice of Proposed Dismissal recommending that Day be dismissed from his teacher position with LCPS. At the time, CPS had not yet issued any finding as to its investigation. Day Ex. 18.

On May 1, 2023, CPS issued a notice advising Day that CPS had determined the Students' report to be unfounded. *Id*. Throughout this process and to date, Day has remained on paid administrative leave. *See* Att. 24 at LCPS000083 (included in LCPS's proposed hearing exhibits to be admitted into evidence). Day timely requested a hearing, which HRTD scheduled before a hearing officer on May 11, 2023. *See* Att. 6. Because of issues with the readability of Day's executed copy of the Hearing Officer Agreement and opposing counsel's failure to cure the issue promptly, the hearing was ultimately rescheduled for October 19, 2023. *See* Att. 6

The reasons for this October hearing date were witness availability with schools closed, licensed staff off for the summer, and the participants' and Hearing Officer's availability. *See, e.g.*, Ex. 25. In September 2023, the parties were notified that the assigned hearing officer would no longer be conducting hearings. HRTD, therefore, identified His Honor as a hearing officer and ensured the hearing proceeded on October 19, 2023, as scheduled. *See* Att. 6.

## V. CONCLUSIONS OF LAW

By a preponderance of the evidence, testimony, and exhibits, the Hearing Officer finds that the Superintendent appropriately recommended Day's dismissal from the School Division's employment for just cause and as authorized by the Virginia Code.

**A.    Consistent with School Board Policy, the Superintendent Appropriately Recommended Day's Dismissal for Just Cause and As Authorized by Title 22.1 of the Virginia Code.**

Section 22.1-307 of the Virginia Code provides, in part, that "Teachers may be dismissed for incompetency, immorality, non-compliance with school laws and regulations, disability as shown

21

LCPS 000436

by competent medical evidence when in compliance with federal law, conviction of a felony or a crime of moral turpitude, or other good and just cause." Va. Code § 22.1-70 makes clear that division superintendents, such as in this case, "shall perform such other duties as may be prescribed by the law, by the school board, and by the State Board." Consistent with these statutory provisions, School Board Policy 3120 *Powers and Duties of the Superintendent* states, "The Division Superintendent must . . . recommend actions to the School Board[.]" Att. __ ¶ A. To that end, School Board Policy 7018(C)(2) describes the procedure for which the Superintendent may recommend the dismissal of a teacher. Att. __.

It is well-settled that school boards have wide discretion in deciding whether to continue employment of their personnel. Discretion, however, means the exercise of judgment, not bias or capriciousness. Thus, such a decision must be based on fact and supported by reasoned analysis. For example, courts

> will not substitute [their] judgment for that of the public body or officer, but rather must decide whether the determination of the school board should be set aside either because it had no basis in fact [citation omitted], or because it was arbitrary and capricious [citation omitted], or because it constituted an abuse of discretion [citation omitted]. Where there is a rational legal and factual basis for a school board's administrative determination, the Court will not overturn such decision and substitute its own judgment even if it would have reached a contrary conclusion [citation omitted].

*Luckett v. City of Harrisonburg Sch. Bd.*, 14 Va. Cir. 76, 82-83 (Cir. Ct. Rockingham Cty.1981). *See also, e.g.*, *Gwathmey v. Atkinson*, 447 F. Supp. 1113 (E.D. Va. 1976) (decided under prior law).

Indeed, the court in *Stone v. Bedford County Sch. Bd.* acknowledged:

> As the Supreme Court of Virginia said in *County School Board v. McConnell*, 215 Va. 603, 212 S.E.2d 264 (1975) (a case inapposite on its facts):
>
> > The great weight of authority is to the effect that the decision of a school board will not be disturbed by the courts unless the board acted in bad faith arbitrarily, capriciously, or in abuse of its discretion, or there is no substantial evidence to sustain its Action.
>
> The court, in *White v. Board of Education, Union Free Sch. Dist., supra*, aptly

22

LCPS 000437

stated:

> The Court will not substitute its judgment for that of the public body or officer, but rather must decide whether the determination of the school board should be set aside either because it had no basis in fact [citation omitted], or because it was arbitrary and capricious [citation omitted], or because it constituted [*15] an abuse of discretion [citation omitted]. Where there is a rational legal and factual basis for a school board's administrative determination, the Court will not overturn such decision and substitute its own judgment even if it would have reached a contrary conclusion. [Citations omitted] 215 Va. at 607.

In *Gwathmey v. Atkinson*, 447 F. Supp. 1113 (E.D. Va. 1976), the federal district court said in a case not applicable on its facts:

> For sound policy reasons courts are loath to intrude upon the internal affairs of local school authorities in such matters as teacher incompetency. School boards, as well as other administrative agencies, should have wide discretion in deciding whether or not to continue employment of their personnel. Discretion, however, means exercise of judgment, not bias or capriciousness. Thus, such a decision must be based upon fact and supported by reasoned analysis. 447 F. Supp. at 1117 (Citations omitted).

*Stone v. Bedford County Sch. Bd.*, (No number in original), 9 Va. Cir. 46, 1981 Va. Cir. LEXIS 30, *1 at *13-*16 (Cir. Ct. Bedford Cty. December 21, 1981).

Here, the Superintendent reviewed the investigation report Wiley had prepared and weighed all evidence relied upon before arriving at the decision to recommend Day's dismissal. He considered the statements made by each student and adult witness and the Students' witness statements themselves. He also considered the School Board policies that had been violated, including their missives that

- with respect to School Board Policy 7014 *Environments Free from Harassment, Discrimination, and Abuse*:

    o "The Loudoun County Public Schools is committed to maintaining a working and educational environment for employees and students which provides for fair and equitable treatment free from harassment and discrimination, including freedom from sex discrimination and sexual harassment. The purpose of this policy is to establish a method for resolving complaints arising from alleged sexual harassment and harassment or discrimination", *see*

23

LCPS 000438

School Board Policy 7014;

- o "Additionally, abusive behavior (as defined in Part II) that interferes with the work or educational environment is prohibited by this policy," *see id.*;

- o "Conduct which may constitute harassment or discrimination may include but are not limited to the following if based on race, national origin, ancestry, color, sex, sexual orientation, perceived sexual orientation, gender identity, pregnancy, childbirth or related medical condition, marital status, age, religion, disability, genetic information, or veteran status: . . . .

  (v) physical or verbal conduct when the conduct: (a) creates an intimidating, hostile, or offensive working or educational environment; (b) substantially or unreasonably interferes with an individual's work or education; or (c) otherwise is sufficiently serious to limit an individual's employment or educational opportunities", *see id.*;

- o "No individual shall discriminate on the basis of sex or harass an employee or student by making unwelcome sexual advances or requests for sexual favors or engaging in other verbal or physical conduct of a sexual nature, including the following: . . . (c) Sexual slurs, leering, epithets, threats, verbal abuse, derogatory comments or sexually degrading descriptions; (d) Graphic comments about a person's body; (e) Jokes, pictures, drawings, notes, social media communications, or gestures of a sexual nature; . . . (i) Engaging in sexualized dialogue with students; [and] (j) Making suggestive comments to students or in the known presence of students", *id.*;

- with respect to School Board Policy and Regulation 7560 *Professional Conduct*:

  - o "The Loudoun County School Board expects all staff, as public employees, to recognize that they are in a position of public trust and are held to the highest standard of personal and professional conduct, serving as role models, influencing and shaping young lives, and representing the school division";

  - o "It is the policy of the School Board to promote and foster work and educational environments that demonstrate the principles of respect, professionalism, civility, and inclusivity";

  - o "Employees are expected to perform all assigned job duties in accordance with performance standards and job-specific requirements (to include attendance-related policies, procedures, and guidelines). Employees are expected to conduct themselves professionally, to treat all individuals with dignity, respect, and civility, and to demonstrate a commitment to an inclusive, safe and supportive work and educational environment where individuals from division";

  - o "Loudoun County Public Schools rejects behavior and language that denigrates or demeans individuals on the basis of actual or perceived race, national origin, ancestry, color, sex, sexual

24

LCPS 000439

orientation, gender identity, pregnancy, childbirth or related medical conditions, marital status, age, religion, disability, genetic information, veteran status or any basis protected by law, recognizing that such behavior and language encourages discrimination, hatred, oppression, and violence";

o "Employees are expected to establish and maintain appropriate physical, social and emotional boundaries with students";

o "All forms of contact and communication with students must be transparent, accessible to supervisors and parents, nonsexual, unambiguous in meaning, and professional in reference and content";

o Employees are expected to conduct themselves professionally and model moral, ethical, legal and respectful behaviors both in and outside the workplace. Employees are expected to work collegially and collaboratively with all school personnel and stakeholders. Unacceptable behavior may include but is not limited to: . . . Use of disrespectful, discourteous, uncivil, disparaging, or demeaning words, gestures, or actions", School Board Regulation 7560;

o "Harassing or discriminatory comments or conduct, including speech or other telephone, electronic, or social media communication that is motivated in whole, or in part—or is reasonably perceived as motivated— by a bias due to an individual's race, national origin, ancestry, color, sex, sexual orientation, perceived sexual orientation, gender identity, marital status, age, religion, disability, genetic information, or veteran status, pregnancy, childbirth or related medical conditions, including lactation, and contrary to or not conducive to an inclusive, safe and supportive work and educational environment," *id.*;

o "The boundary of the employee-student relationship must be maintained at all times. Examples of behaviors that may constitute an inappropriate or intimate social relationship or communication with a student may include, but are not limited to: a. Conversations and comments of an intimate, romantic or sexual nature; b. Commentary on a student's physical appearance or clothing that could reasonably be interpreted as sexual, flirtatious or harassing", *id.*

Based on the Superintendent's application of school policy to the facts and findings summarized in the investigative report, the Superintendent determined Day had violated School Board Policies 7014 and 7560 and Regulation 7560.

Day has not provided any evidence that refutes the School Divisions' personnel decision relative to his conduct. His mere disagreement with the decision is insufficient to overturn the

25

LCPS 000440

Superintendent's sound basis for recommending his dismissal without cause.

For these reasons, the Superintendent lawfully recommended Day's dismissal for violating School Board policy. His recommendation should be upheld.

**B.      Wiley's Investigation Supported a Finding of Just Cause to Recommend Day's Dismissal.**

Day contends that Wiley inappropriately relied on evidence to support a finding that her investigation did not sufficiently support the facts leading to his recommended dismissal. However, Day has offered little more than his own conclusory, self-supporting statements and contentions.

As the investigator who interviewed the witnesses closer in time to the events in this matter, Wiley considered the credibility of each witness, including Day's. She found that Day's statements in total were not as credible. For instance, he responded that he did not recall several statements he was accused of making. When asked several times if he had anything he wanted to add, Day used the opportunity to ask questions about, for example, the impact on his evaluation cycle. He did not identify any individuals who could help refute his claims. And he never submitted any evidence in support of his assertions.

On the contrary, the Students each made statements that were consistent and corroborated by adult witnesses who otherwise were colleagues and coaching peers of Day. Ford overheard at least one statement Day made to the Students. Additionally, Windows and Ford recalled the Students confiding in them about their concerns regarding Day's comments and their impact on the Students. Considering this and the other documentary evidence provided during this investigation, Wiley determined that it was more likely than not that Day engaged in conduct that violated School Board Policies 7014 and 7560, along with School Board Regulation 7560.

Day claims that with additional documentation (without identifying what it could be in a

26

case that primarily hinged on statements of the reporting Students, Day himself, and other witnesses who heard the statements), this investigation could have been conducted more thoroughly, something that Wiley acknowledges might be true. In this case, Wiley conducted a full investigation within the reasonable parameters afforded. She had to consider and, for a time, yield to a corresponding investigation by CPS while at the same time conducting this investigation as confidentially and promptly as reasonably appropriate.

In any event, Day's efforts to discredit the investigation disregard that Wiley considered evidence that erred in Day's favor, such as his outright denials of certain statements, as well as that two of his football coach peers admitted that they had overheard Day make at least one remark to the Students that violates School Board Policies 7014 and 7560.

He also fails to acknowledge that Wiley investigated Day's contention that the Students reported him for misconduct after he complained that they were parking in staff parking spaces. Unfortunately for Day, the evidence Wiley uncovered -- and which was presented at the hearing on this matter – actually refuted Day's claims: the School Security Officer promptly conducted his own inquiry into the matter and, through that, identified the individuals who had parked in unauthorized spaces; the School Security Officer specifically spoke to G█████ because she had done so; the School Security Officer never disclosed who had made the report; there was no evidence that K███ had been reported by Day; and neither G█████ nor K███ had been disciplined. In fact, G█████ was never reported as parking there again, nor were any of the vehicles on Day's two emails on the matter a match.

With the facts in mind, Day's arguments are misleading. They should not be permitted to cast a net of invalidity or incompetency on Wiley's investigative findings or the manner and conduct of her investigation.

LCPS 000442

**C.**    **The Investigation Was Conducted As Promptly As Appropriate Given the Circumstances, and None of the Evidence is Barred by any Statute of Limitations or School Board Policy.**

During his hearing, Day contended that any conduct occurring prior to two years from the date of the Recommendation for Dismissal is barred by Virginia's statutes of limitations contained in Chapter 4 of Title 8.01 *Civil Remedies and Procedure* of the Code of Virginia.

However, Day's argument fails because the statutes of limitations, which he seeks to apply, only apply to actions and suits and not to this administrative proceeding, falling entirely within the bounds of Chapter 15 of Title 22.1 of the Code of Virginia. To that end, Section 8.01-2 makes clear: As used in this title, unless the context otherwise requires, the term: 1. 'Action' or 'suit' may be used interchangeably and shall include all civil proceedings whether upon claims at law, in equity, or statutory in nature and whether in circuit courts or district courts."

Concerning his claims that Wiley "blew" the deadline applicable to Title IX actions, Day's argument also fails; nowhere in the Title IX of the Education Amendments Act or its implementing regulations is there a deadline by which an investigator must complete a Title IX investigation. Were this the case, nearly every harassment action would be time-barred, as these actions typically span lengthy periods, require interviewing several witnesses, and necessitate reviews of institutional practices and policies. On the contrary, Title IX's implementing regulations only require that the grievance process include reasonably prompt time frames for the conclusion of the grievance process. Therefore, Day's arguments that Wiley only investigated this matter for violations of Policy 7014 and Policy and Regulation 7560 violations after she missed her deadline for complying with Title IX are misleading and false.

The same is true for Day's arguments that Wiley illegally investigated this matter jointly with CPS or that she did not complete this investigation as soon as practicable, given the circumstances. Va. Code 63.2-1511 clarifies that CPS and LCPS could enter an interagency

LCPS 000443

agreement regarding the investigations of such matters. Wiley testified that such an agreement exists between CPS and LCPS and that she conducted the investigation following that agreement. Documentation admitted into evidence, including Day's own finding letter, demonstrates that CPS did not, for whatever reason, complete the investigation within their statutory timeframe. After it became clear that CPS would not complete its investigation in a timely manner, to prevent any further delay, Wiley moved forward with the investigation with which she was charged. Given these circumstances, the investigation was completed as promptly as practicable.

**D.      LCPS REQUEST HOLDING THE HEARING OPEN TO ADMIT EVIDENCE PREVIOUSLY EXCLUDED IN LIMINE**.

The motion *in limine* to hold this hearing open for further evidence regarding procedural aspects of the investigation has been reconsidered. The motion to hold open is denied, and the hearing is over as of October 27, 2023, at 5:00 p.m. EST.

**CONCLUSION**

Wherefore, for the reasons stated above, as well as for those provided at the hearing of this matter, and for such other good cause shown, Superintendent Aaron Spence the recommendation for Day's termination of employment with Loudoun County Public Schools is sustained and that such other relief deemed just and appropriated be granted.

Dated:  November 3, 2023.                                    **Respectfully submitted,**
                                                             /s/ *William T. Newman, Jr.*

                                                             William T. Newman, Jr.
                                                             Hearing Officer
                                                             Arlington Circuit Court Judge (Retired)

29

**LCPS 000444**