RECOMMENDATION FROM MEDIATION:

LOUDOUN COUNTY PUBLIC SCHOOLS,    )
*Employer*,                       )    Case No. 20223000476
                                  )
v.                                )    Date: November 4, 2023
                                  )
BRIAN B. DAY,                     )    Hon. William T. Newman Jr.
*Employee*.                       )
                                  )

RECEIVED
NOV 0 6 2023
SUPERINTENDENT

## ADDITIONAL DOCUMENTS TO COMPLETE THE RECORD

Dear Dr. Spence,

Pursuant to § 22.1-311 enclosed are the proposed Findings of Fact and Conclusions of Law for both Loudon County Public Schools and the Defendant Brian Day. They were inadvertently left out of the package sent yesterday with my decision and Findings for this matter.

These two documents are a part of the record for this case and should be received and made a part thereof. You now have what I believe is the complete record of this matter for your consideration.

Should you have questions do not hesitate to contact me.

Dated:  November 4, 2023.

**Respectfully submitted,**
/s/ *William T. Newman, Jr.*

William T. Newman, Jr.
Hearing Officer
Arlington Circuit Court Judge (Retired)

LCPS 000372

# LOUDOUN COUNTY PUBLIC SCHOOLS'

# PROPOSED FINDINGS OF FACT AND

# CONCLUSIONS OF LAW

LCPS 000373

LOUDOUN COUNTY PUBLIC SCHOOLS
21000 Education Court
Conference Room – 104G
Ashburn, Virginia 20148

|  |  |
|---|---|
| LOUDOUN COUNTY PUBLIC SCHOOLS | Case No. 20223000476 |
| Employer, | Date: October 26, 2023 |
| vs. | |
| BRIAN B. DAY | Hon. William T. Newman, Jr. |
| Employee. | |

## LOUDOUN COUNTY PUBLIC SCHOOLS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Aaron Spence, Ed.D., Superintendent, Loudoun County Public Schools ("LCPS" or "the School Division"), by and through undersigned counsel and pursuant to Judge William T. Newman, Jr.'s ruling, submits this Proposed Findings of Fact and Conclusions of Law in the above-captioned action.

As explained further below, the recommendation to terminate Brian D. Day's ("Day's") employment with the School Division should be sustained. As discussed below, the evidence demonstrates that Day's conduct violated Loudoun County School Board Policy ("Policy") 7014 *Environments Free from Harassment, Discrimination, and Abuse* (Att. A) as well as Policy 7560 *Professional Conduct* (Att. B) and its accompanying regulation (Att. B1).[1] As such, the School

---

[1] These along with the Loudoun County School Board's other policies are publicly available online, and can be accessed by visiting https://www.lcps.org/page/75.

Division has sufficient cause to justify the Superintendent's recommendation that Day's employment with the school division be terminated.

## THE SCHOOL DIVISION'S PROPOSED FINDINGS OF FACT

In support of his recommendation, the Superintendent submits the following findings of fact:

### A. Day Begins Working for LCPS.

1.  Effective August 3, 2015, LCPS hired Day as the Varsity Head Coach of its football program at Riverside High School. *See* the School Division's proposed exhibits (hereinafter, "Exhibits") at Ex. 24.

2.  Subsequently, on or about August 19, 2015, the School Division also hired Day to work as a Physical Education ("PE") Teacher at Riverside High School. *See* Ex. 24 at LCPS000005-LCPS000009, LCPS000076-LCPS000079. Additionally, from August 31, 2015 to June 16, 2016, Day served as Riverside High School's Activity Coordinator. *See id.*

3.  Day continued working at Riverside High School through the end of the 2019-2020 school year, after which he transferred to Independence High School. *E.g.,* Ex. 24 at LCPS000063.

4.  On or about August 15, 2020, Day transferred to Independence High School, where he worked as a PE Teacher and a football coach. *See, e.g., id.*

5.  John Gabriel, Principal of Independence High School ("Gabriel"), interviewed and hired Day. *See, e.g., id.*; Hr'g. Tr. 127:15-17.

### B. LCPS Has Implemented a Policy and Procedures That Address Reports of Suspected Child Abuse or Neglect.

6.  Loudoun County School Board Policy 7530 addresses School Division employees' obligations to report potential abuse or neglect of a child. *See* Post-hr'g Submissions Att. 1 (also admitted as Day's hearing exhibit 7); LCPS's Office of Student Services *Child*

2

LCPS 000375

*Protective Services Referral* website, available at https://www.lcps.org/Page/228204#:~:text=All%20LCPS%20staff%20are%20considered,Report%20Child%20Abuse%20and%20Neglect.

(Att. 1).

7.      School Board Policy 7530 provides, in part:

*Pursuant to Va. Code § 63.2-1509 et seq., and Va. Code § 63.2-1606, any employee, who, in their professional or official capacity, knows, or has reasonable suspicion that a child or student is the subject of abuse or neglect, or exploitation if a student is 18 years old or over, shall report such knowledge or reasonable suspicion immediately (i.e., as soon as possible, but not longer than 24 hours after having reason to suspect a reportable offense of child abuse or neglect) in accordance with Section A.1 of this policy.*

Att. 1.

8.      Section A.1. of School Board Policy 7530 requires that "[a]ny teacher or other school employee who has reason to suspect abuse, neglect, or exploitation of a child or student shall immediately report it to: a. [t]he principal or designee (such as an assistant principal, counselor, social worker, etc.) or supervisor of the department, who shall make such report forthwith." Att. 1.

9.      Pursuant to this policy, "[t]he initial report should be an oral report submitted directly to Child Protective Services" by calling the Loudoun County Child Protective Services ("CPS"). Att. 1.

10.     The principal or their designee must then submit the report in writing using the LCPS online CPS reporting portal. *Id.*

11.     LCPS procedure mandates that "**[n]o further investigation, regarding the alleged neglect or abuse, should be conducted by staff.**" Att. 2 (publicly available online at https://www.lcps.org/Page/228204) (emphasis in original).

3

LCPS 000376

## C. LCPS and CPS Have Entered an Interagency Agreement That Provides Guidelines and Protocols For Reports of Suspected Child Abuse or Neglect.

12.    LCPS and CPS have an interagency agreement that "provide[s] guidelines and procedures for the coordination of services in Loudoun County Child Protective Services' child abuse investigations/assessments involving children who attend Loudoun County Public School[s] and/or alleged abusers who are Loudoun County Public School[s] employees as defined [a]nd referenced in § 63.2-1511 of the Code of Virginia". Hr'g. Tr. 223:18-21; Att. 3.

13.    The interagency agreement is entered pursuant to Va. Code § 63.2-1511(D). Att. 4.[2]

14.    The interagency agreement provides that "Extensive questioning of a victim, witness, or alleged abuser should be avoided until a CPS investigator is involved." Att. 3.

15.    Additionally, the interagency agreement states that "LCPS shall report the suspected abuse/neglect immediately in order for CPS to initiate the investigation in a timely manner." *Id.* § 2.

16.    The interagency agreement also provides that "CPS shall investigate all valid reports of child abuse/neglect and determine the family's need for services." *Id.* ¶ 3.

17.    The interagency agreement permits for LCPS to designate an employee from its Department of Human Resources and Talent Development ("HRTD") (formerly known as Personnel Services) "to participate in and receive information in the event of any investigation of a school employee who is alleged to have abused/neglected a child." *Id.* ¶ 3.

18.    Pursuant to the interagency agreement, CPS and the LCPS HRTD designee "will plan and implement a joint investigation." *Id.*

---

[2] LCPS requests that His Honor take judicial notice of this and other provisions of the Code of Virginia.

4

LCPS 000377

19.     The interagency agreement requires that, in cases where the investigation involves

a school employee as the alleged abuser,

> *LCPS shall cooperate with the needs of the CPS worker, and provide the following*
> *resources, as appropriate:*
>   *1. Room/private space for interviews of staff and children.*
>   *2. Accompaniment of the CPS worker to the site of the alleged abuse.*
>   *3. Pertinent policies, procedures and records.*
>   *4. Names, functions, and roles of involved parties.*
>   *5. Work schedules of staff[.]*
>   *6. Pertinent directory information[.]*

Att. 3 "Responsibilities of Loudoun County Public Schools" § B.

20.     The interagency agreement requires CPS and the LCPS HRTD designee to

interview any employees reported as an alleged abuser "according to a plan developed jointly."

*Id.* "Responsibilities of Loudoun County Public Schools" § D.

21.     Moreover, the interagency agreement states that the CPS worker and the LCPS

HRTD designee "shall interview collateral witnesses, as appropriate to a plan developed jointly

and this [agreement]. If there is an apparent conflict of interest, the CPS worker shall use

discretion regarding who is to be present in the interview." *Id.* "Responsibilities of Loudoun

County Public Schools" § G.

22.     The interagency agreement provides that "Nothing contained herein shall be deemed

to prevent LCPS from conducting its own investigation of any employee misconduct in the event that

LCPS and CPS cannot agree on the planning or conducting of a joint investigation". *Id.*

"Responsibilities of Loudoun County Public Schools" § O.

23.     The interagency agreement requires that "[i]nformation [] be shared between the

CPS Unit and LCPS that is complete, timely end pertinent so as to ensure the accuracy of the

determination of the disposition of the complaint consistent with FERPA and the Virginia

Administrative Code"; and that "[a]ll information gathered as a result of a child abuse or neglect

5

LCPS 000378

investigation or family assessment shall be treated confidentially, in accordance with Family Services and Education requirements and Virginia Code§ 63.2-105 and the Virginia Administrative Code." Att. 3 "Information Sharing and Confidentiality" §§ A, E.

### D. Two Students Report to the School Counseling Office That Beginning in the 2020-2021 School Year, When He Had Transferred to Independence, Day Had Made Several Comments and Remarks of a Sexual Nature.

24. On March 31, 2022, two students, G██ L███ ("G███") and K██ "K██ R██ ("K██") (together, "the Students"), visited the School Counseling Office at Independence High School (Hr'g. Tr. 165:9) and met with School Counselor Laura Northart ("Northart"). *See* Hr'g. Tr. 168:4-7.

25. Northart knows K███, or K██ because she served as K██'s school counselor when K█ was a ninth-grade student, Hr'g. Tr. 163:16; At the time of the report, K██ was an eleventh-grade student. Hr'g. Tr. 165:9.

26. Northart knows G███, because at the time of the report, Northart served as G███'s school counselor. Hr'g. Tr. 163:15.

27. Northart believes the Students to have never been untruthful in their discussions with her. Hr'g. Tr. 164:20 and 165:4.

28. Gabriel also knows the Students. Hr'g. Tr. 133:16 and Hr'g. Tr. 134:5.

29. Gabriel knows the Students to be good students. Hr'g. Tr. 138:19-20.

30. The Students do not have any disciplinary issues. Hr'g. Tr. 138:20-21.

31. In fact, Gabriel wrote a letter of recommendation on G███'s behalf to a sorority to which she was pledging since matriculating to college. Hr'g. Tr. 139:2-6; Att. 5 (also submitted as one of the School Division's proposed exhibits).

32. During the period at issue, the Students were football managers at Independence High School. *See* Ex. 10; Hr'g. Tr. 96:20-21 and 241:12-13.

6

LCPS 000379

33.     The Students told Northart that since Day had begun working at Independence High School, i.e., since the 2020-2021 school year, he had made inappropriate comments to them. *See* Ex. 10; Hr'g. Tr. 168:4-7.

34.     As part of her report to Northart, G█████ alleged that Day had:

 a. commented to G█████ her outfits were too skimpy (Hr'g. Tr. 201:3);
 b. told G████ that guys only use her for her body (Hr'g. Tr. 201:4);
 c. implied that G███ is a whore (Hr'g. Tr. 201:2-3); and
 d. told G███ she has had sex with the whole football team (Hr'g. Tr. 231: 14-15; Ex. 10 at Att. B).

35.     K██████ had reported that Day had:

 a. repeatedly called K█████ a slut and a whore (Hr'g. Tr. 197:21-22);
 b. told K█████ she is always on her knees (Hr'g. Tr. 198:1);
 c. told K█████ he was going to buy her a gift from Toys R Us for her baby shower, implying she would get pregnant while in high school (Hr'g. Tr. 198:1-3);
 d. remarked to K█████ that the only reason she would go to college is so she could "f**k around with all the D1 football athletes" (Hr'g. Tr. 198:3-4);
 e. told K█████ that if he was her age, she would be all over him and he would reject her (Hr'g. Tr. 198:4-6);
 f. told K█████ that boys would use her for her money (Hr'g. Tr. 198:13);
 g. commented to K█████ that her clothing gives the impression she is a slut (Hr'g. Tr. 305: 16; Ex.  at Att. B.).

36.     Northart is a mandatory reporter in accordance with Va. Code § 22.1-293 (attached as Att. 5).[3] Hr'g. Tr. 163:1-8.

37.     As such, and pursuant to Va. Code §§ 22.1-293 and 63.2-1509 along with School Board Policy 7530,[4] Northart, "in place of said report, immediately notif[ied] the person in charge of the institution or department, or his designee, who shall make such report forthwith." Hr'g. Tr. 172:5-7. Va. Code § 63.2-1509(A).

38.     Consistent with LCPS procedure, Northart did not initiate her own investigation

---

[3] LCPS requests that His Honor take judicial notice of this and other provisions of the Code of Virginia.

[4] LCPS requests that His Honor take judicial notice of this and other provisions of the Code of Virginia.

LCPS 000380

into the Students' reports. *Compare* Hr'g. Tr. 186: 9-11 *with* Att. 2.

39.    In accordance with Va. Code § 63.2-1509(A), Northart notified Jaclyn Smith ("Smith"), the Independence High School Director of School Counseling. Hr'g. Tr. 169:1.

40.    Smith serves as one of Gabriel's Va. Code § 63.2-1509 designees. *See* Hr'g. Tr. 130:20-22).

41.    Northart provided the Students with blank forms so they could each write a statement describing the matters they wished to report. Hr'g. Tr. 174:4-5.

42.    On the form provided to K███, which she dated March 31, 2022 (Ex. 10 at Att. A), K███ stated, inter alia:

> a.   in response to "Date of Incident", "ongoing for the past two years." Ex. 10 at Att. A.
> b.   in response to "Please write your detailed account of the incident",

> The past two years, there has been an ongoing of stuff said to me from Coach Day about being a slut/whore. He's said that I am always on my knees, that he going [sic] to buy me a gift from toy r us [sic] for my baby shower (that would happen in high school) said [sic] the only reason I'll go to college is to fuck around with all the D1 football athletes. Said that if he was our age we would be all over him and he would reject us. . . . These comments said to me made me believe and accept it. But these comments shouldn't be said around the school. It's not creating the environment that I want to go here.
> . . .
> Said that the outfits I wear give the impression of being a slut.

Ex. 10 at Att. A.

43.    On the form provided to G███, which she dated March 31, 2022 (Ex. 10 at Att. A), G███ stated, inter alia:

> a.   in response to "Date of Incident", "Continuous since he came to the school."
>
> *Id.*
>
> b.   In response to "Please write your detailed account of the incident",

> He has said multiple inappropriate things when we're alone walking to the field, getting equipment for football, in the hallways, etc. It's been going on since he

8

LCPS 000381

came to the school two years ago. Some things he's said are that I'll never get a boyfriend because I've been around too much, comments about outfits being skimpy, said guys only use me for my body, and many more. The comments he makes it makes me feel like he's implying that I'm a whore and that's not the best feeling. . . . Most of the comments that he's made happened when I was alone with him so unfortunately there's no one else to back me up other than K▬ but this isn't something I would ever lie about and take it seriously. Over the year I just started to accept it because I didn't think I had enough proof for anything to be done. One of my bigger concerns is that he may say stuff to other girls in is class or potential new managers. . . . He's also made multiple comments about me having sex with the whole football team (when I never did. [sic.]"

Ex. 10 at Att. A.

44.    Each of the Student's statements identify the school administrator responsible for taking the reports as Kelly James, an assistant principal at Independence High School. *See* Ex. 10 at Att. A; Hr'g. Tr. 175:10-16.

45.    Northart did not direct the Students on what to write, other than to tell them to be as detailed as possible. Hr'g. Tr. 174: 17-19.

46.    The Students wrote their own statements. Hr'g. Tr. 176: 1-4; Ex. 10 at Att. A.

47.    Northart sat with Smith while she contacted the CPS to make referrals relative to each of the Student's reports. Hr'g. Tr. 172: 14-18.

48.    She provided Smith the information to report to CPS. *Id.*

    a.    On the written referral generated for G▬, the narrative states, in part:

C▬ reported to her school counselor and Assistant Principal that Mr. Day has said inappropriate comments to her since he joined our faculty at Independence [High School] two years ago. She says he had made the following comments: - her outfits are too skimpy – . . . implies she's a whore - . . . accusations that she has had sex with the whole football team She [sic] has indicated that she feels very uncomfortable around him. Our Principal has called LCPS R, who asked us to report this to CPS and our Sheriff.

Ex. 10 at Att. B.

    b.    With regard to the referral Smith generated for K▬, the narrative states, inter alia:

9

LCPS 000382

K███ reported to a school counselor and an Assistant Principal that over the past two years Mr. Day has repeatedly called her a slut and whore. In addition, K███ reported that Mr. Day has made the following comments to her: - "I'm always on my knees" – That he's going to buy her a gift from Toys R Us for her baby shower, implying she will get pregnant in high school. – the only reason she would go to college is to "fuck around with all the D1 football athletes" – if he was our age, she would be all over him and he would reject her – . . . that the outfits she wears give the impression of being a slut She [sic] has shared that it is creating an environment at school that she does not want to go here. Our Principal called LCPS HR and they directed us to call CPS and inform our Sheriff.

Ex. 10 at Att. B.

49.     Northart sat with Smith while she prepared and submitted the written referrals to CPS. *Id.* 172:3-173:5.

50.     Additionally, Gabriel was aware of the Students' reports against Day because he was in the main office when the Students made their reports. *See* Hr'g. Tr. 130:1-2.

### E.  LCPS Conducts Its Investigation into the Students' Reports About Day.

51.     Pursuant to School Board Policy, on March 31, 2023, Gabriel notified HRTD about the CPS referrals filed on the Students' behalf.  Ex. 10; Hr'g. Tr. 218:5-8.

52.     HRTD placed Day on paid administrative leave, effective March 31, 2022.

53.     HRTD assigned Angela Wiley ("Wiley") to investigate the Students' reports on behalf of the School Division. *See* Ex. 10; Hr'g. Tr. 217:17.

54.     On April 5, 2023, a CPS investigator, along with Wiley, interviewed each of the Students separately with their respective parents present. *See* Ex. 10; Hr'g. Tr. 240:17-21 and 245:13-16.

55.     During K███'s interview, she stated:

   a.  She had been a football team manager for the past three years. Ex. 10 at 4 (LCPS00006).
   b.  She and C███ manage the varsity team. *Id.*
   c.  She and C███ also oversee the junior varsity football team managers. *Id.*
   d.  The football managers work independently with each of the football coaches at Independence High School. *Id.*

10

LCPS 000383

e. K███ met Day during the 2020-2021 school year. *Id.*

f. Due to pandemic-related concerns and restrictions, the football season did not commence until January 2021. Ex. 10 at 4 (LCPS00006).

g. School operations had been mostly virtual because of the COVID-19 pandemic. *Id.*

h. As students began attending school in-person more frequently, K███ interacted with Day. *Id.*

i. Upon the start of the 2020-2021 football season in January 2021, K███ interacted with Day a few times daily. *Id.*

j. One to one and a half months into knowing Day, K███'s interactions with him became uncomfortable. Ex. 10 at 4 (LCPS00006).

k. A majority of her interactions with Day occurred privately on the football field. *Id.*

l. Day told K███ privately:

    i. "The only reason you want to go to Ohio State is because you want to fuck all of the D1 players." Ex. 10 at 4 (LCPS00006)

    ii. Day was going to buy K███ a baby shower gift from Toys "R" Us, insinuating she was going to get pregnant in high school. *Id.*

    iii. On more than one occasion, that her outfits were slutty. *Id.*

    iv. "Oh, don't wanna bend down; your ass might show." *Id.*

    v. "You are looking kinda whorey today." Ex. 10 at 5 (LCPS00007).

m. K███ did not address or acknowledge Day's comments at the time they were made, but the comments bothered her. Ex. 10 at 5 (LCPS00007).

n. G███ witnessed some of the statements that Day had made to her. *Id.* These comments included:

    i. During a conversation with G███ in the 2021-2022 football season, K███ told Day se was catholic and holy. *Id.* Day commented, "Of course you are holy because you love being on your knees." Ex. 10 at 5 (LCPS00007).

    ii. On a day when K███ was wearing shorts with pineapples on them, Day commented that her shorts stood for swingers and that she was going to be a swinger. *Id.*

    iii. K███ looked up what Day was talking about and when she realized what swingers were, she became uncomfortable. *Id.*

    iv. During a conversation with K███ and G███, Day told them they would be all over him if he was in high school and he would have rejected them, insinuating that they were attracted to Day. *Id.*

o. K███ told some football players she was uncomfortable with some of Day's comments, but the players laughed it off and said, "That's Day being Day." Ex. 10 at 5 (LCPS00007).

p. K███ was apprehensive about reporting the behavior because she did not want the complaint to impact her ability to manage the football team or her relationships with the team and coaches. *Id.*

11

LCPS 000384

q. K███ trusted her instincts and reported Day's behavior to an Carnadi Ford ("Ford"), an assistant football varsity football coach at Independence High School, and to R.J. Windows ("Windows"), the head varsity football coach at Independence High School. *Id.*

r. Ford had instructed K███ to speak with Windows. *Id.*

c. Windows listened to K███ and directed her to Independence High School's counseling office and to the school administrators. *Id.*

56. During C███'s interview, C███ stated:

a. She manages three sports: football, wrestling, and lacrosse. Ex. 10 at 5 (LCPS00007).

b. She loves working with the teams and players. *Id.*

c. She works mostly with the football coaches. *Id.*

d. Most of the football coaches have been respectful and "like family" to her. *Id.*

e. G███ had been managing the football team for the past three years. Ex. 10 at 5 (LCPS00007).

f. G███ met Day during the 2020-2021 school year, when she was a sophomore. *Id.*

g. Day began making weird comments, but she brushed them off because the football players would say, "Oh, that's just Day being Day." *Id.*

h. She realized Day's comments were not appropriate when she began talking to K███ about some of the comments. *Id.*

i. G███ was not sure why Day would make the comments to her and K███ *Id.*

j. Day remarked:

   i. to K███ and G███ about them having sex with the entire football team, Ex. 10 at 5 (LCPS00007);

   ii. that G███ would never get a boyfriend because she has "been around", *id.*;

   iii. that boys would only use G███ for her body, *id.*;

   iv. that G███'s outfits were inappropriate and skimpy, *id.*;

   v. that if Day and G███ were in high school together, she would be all over him and he would reject her, *id.*;

   vi. on a day when G███ and K███ had on matching pineapple shorts, that she and K███ were going to be swingers, Ex. 10 at 5 (LCPS00007).

k. Day's comments made her feel uncomfortable, especially because she felt Day was looking at her body. *Id.*

l. Day's comments made her feel that she was a whore. *Id.*

m. Because of Day's comments that her outfits were inappropriate and skimpy, she is now self-conscious about her clothing. *Id.*

12

LCPS 000385

57.     Wiley also interviewed Ford and Windows.[5] *See, e.g.,* Ex. 10 at 4 (LCPS0006).

58.     Ford told Wiley he had overheard Day state to K███ that "if he were in school, he wouldn't touch her, but they [i.e., K███ and G███] would be all over him." *Id.* at 5 (LCPS00007).

59.     Ford informed Wiley that on at least two separate occasions since the beginning of the 2021-2022 school year, K███ and G███ had confided him about feeling uncomfortable around Day. Ex. 10 at 6 (LCPS0008).

60.     Ford stated to Wiley that on the last occasion, in March 2022, he suggested K███ and G███ speak with Windows. *Id.*; Hr'g. Tr. 275: 10-15.

61.     Windows stated he supervises Day as the physical education department chair and the head football coach, and that he supervises the football managers. Ex. 10 at 6 (LCPS00008).

62.     Windows stated the severity of the information reported by K███ and G███ in March prompted him to have K███ and G███ report their concerns to the Independence High School counseling office and school administrators. *Id.*

63.     With respect to Day's own interview, Day, who had retained counsel, made several objections to the process before ultimately agreeing to submit to an interview with LCPS's investigator only. *See* Hr'g. Tr. 224:12-15; *see also, e.g.,* Att. 6.

64.     On May 17, 2022, Wiley interviewed Day without CPS present because Day had refused to participate in any interview with CPS in attendance. *See* Ex. 10; Hr'g. Tr. 224:12-14.

65.     During the May 17, 2022 interview, Day responded to the questions set out below as follows:

> a.     Wiley: Is it something that you would typically do, and I know that you're a coach as well, so in either capacity as a teacher or as a coach would you

---

[5] Wiley interviewed Windows on May 5, 2022, and Ford on July 13, 2022.

13

have used inappropriate language at any time? (Att. 7 at 4:20-24 (also admitted by Day as hearing exhibit 22.))

Day: Something I try very hard to not do. (Att. 7 at 5:1-2.)

b.  Wiley: Okay. So then there was another allegation of inappropriate or insensitive comments to female students, specifically students that manage the football team and during that period of time when it's in between practice and school, just making insensitive comments or comments that may be perceived as inappropriate. Do you have any idea what that would be about? (*Id.* at 5:3-11.)

Day: Not to my recollection, no. (*Id.* at 5:12.)

c.  Day: So this is the football managers?

Wiley: Correct

Day: I'm assuming this is during football season?

Wiley: Yeah.

Day: Is that what they're saying?

Wiley: Well, over the period of the last two years were the run of the mill type comments, during the season, outside of the season, at PE.

Day: Um, okay.

Wiley: During that time period. Have you ever referred to a female student as a slut or a whore?

Day: No.

Wiley: Along those same lines, commenting to a student that 'You're looking whorey today?'

Day: No. '

Wiley: No, you didn't make the statement or no, you don't have a recollection either way?

Day: No, I don't recollect. That's not something I would say and I don't have a [re]collection of ever saying it. (*Id.* at 13:5-14:5.)

d.  Wiley: So, there was also another report that there was a discussion about swingers and pineapple shorts, and I'm not really sure what the correlation between the two is, but they alleged that there was a conversation about swingers and pineapple shorts. Do you have any recollection of a conversation about any of that?

Day: Well, the pineapple is a symbol of swingers, but I don't recollect necessarily a conversation about calling girls swingers.

. . .

Wiley: So when she wore the shorts, was there a conversation about the shorts?

Day: Not that I remember. (Att. 7 at 14:6-23.)

e.  Wiley: Oh, then there was another allegation or report that you spoke to a female student about her attire and her clothing being skimpy and guys using her for her body. Can you talk to me a little bit about that specific allegation?

14

LCPS 000387

> Day: I cannot.
> Wiley: You don't recall?
> Day: I don't recall. It doesn't sound like something I would say. (Att. 7 at 14:24-15:9.)

    f.  Wiley: Another allegation is that you made a comment that you were going to buy a student gifts from Toys "R" Us because she is going to get pregnant in high school. Do you recall having any kind of conversation like that --
> Day: No.
> Wiley. -- or what is your response to that allegation?
> Day: I do not remember having any conversation like that. (Att. 7 at 16:10-20.)

66.    Wiley asked Day about his relationship with the students and for his perspective as to why they would make up the allegations. Att. 7 at 17:10.

67.    Day responded that he had reported that several individuals were parking in staff-designated spots in February or March 2022, and "about a week from there, two football managers in the boys PR hallway as I said, 'Hello, how are you doing?' said 'I'm not speaking to you' and I said, 'Okay. How come?' And she said 'You know why' which I didn't know why." Att. 7 at 18:16-20.

68.    Day assumed this exchange had to do with his complaint to the school's Safety and Security Officer, Brian Elliott ("Elliott"), that several individuals had parked in staff parking spaces. *Id.* at 18:23-19:12.

69.    Day also assumed that the reports made by the Students was retaliatory in nature because he had reported that several individuals -- some students, and others who turned out to be LCPS personnel -- had parked in the spaces at issue. *Id.* at 19:13-20:8.

70.    Day explained the Students commented how he was a "horrible leader" and "a horrible person" in response to an Instagram post he had made "about encouraging kids about being good leaders and et cetera". Att. 7 at 20:9-16.

71.    Day explained the nature of his relationship with the Students prior to and

15

LCPS 000388

following his reports to Elliott extensively, even describing how he helped one of the Students navigate a breakup with a football player. *See* Att. 7 at 17:5-21:4.

72.     Wiley provided Day with yet another opportunity to provide additional information in rebuttal to the Students' reports by asking, "Anything else you can think of? Have you had any conversations with any of the other coaches about any concerns?" *Id.* at 22:1-3.

73.     Day responded by describing interactions with two other Independence High School employees, R.J. Windows and Matt Shannon, concerning his status. *Id.* at 22:4-18.

74.     Day did not provide any additional information or context in rebuttal to the Students' reports. *See id.*

75.     Wiley also afforded Day the opportunity to ask questions, to which she responded. *See id.* at 24:2-36:15.

76.     In response to Day's inquiry into "the process from here moving forward", Att. 7 at 33:14-21, Wiley explained that the investigation could extend into the following school year because she had "to wait for CPS to close their case before [she] can even really start [her] case." *See id.* at 33:22-35:23.

77.     "Because CPS and LCPS at the time were working jointly, [Wiley] was able to kind of tag along with some of those meetings and some of those interviews," but she could not submit anything until CPS closed its investigation. *Id.* at 34:2-7.

78.     At the time, Wiley estimated that the CPS investigation could take upwards of 90 working days to complete. *Id.* at 34:8-20.

79.     Wiley further explained:

> So I won't be able to submit my stuff until -- now my report will probably be done, but I can't submit anything until they've made a determination, then it had to go through the chains here and that could take anywhere from a week to a month, just depending on what all is going so. So, and if I'm being realistic, I

16

LCPS 000389

wouldn't think that it would be resolved by the end of the school year.

. . .

Just because I'm waiting on CPS.

Att. 7 34:21-35:6, 35:8-9.

80.     Wiley advised that the length of time to complete the investigations "really depends and then of course whatever [HRTD's] decision is, [HRTD] would communicate when [it] finish[ed], but [Day would] probably get a letter from CPS before [HRTD does] saying that [CPS had] completed [its] portion or whatnot and then [HRTD] would move forward with [its own]." *Id.* at 35:13-18.

## F. After CPS Failed to Complete Its Investigation Into the Students' Reports For Several Months, HRTD Advances Its Own Investigation Into Whether Day Had Committed Any School Board Policy Violations.

81.     On July 11, 2022, 66 days from the date CPS and Wiley jointly interviewed the Students, Wiley requested a status on the disposition of the CPS investigation. *See* Ex. 10 at Att. D; Hr'g. Tr. 236:22.

82.     The assigned investigator's "email was bumping back to" her and CPS reassigned its case to a new investigator. *Id.*

83.     At that time (July 11, 2022), the CPS investigation was "still pending (open)". *Id.*

84.     By July 26, 2022, 77 workdays after CPS and Wiley jointly interviewed the students, CPS had not completed its investigation. *See* Ex. 10 at 2 (LCPS00004); Hr'g. Tr. 245:13-14.

85.     After CPS's investigation remained open, and consistent with the interagency agreement between CPS and LCPS, HRTD moved forward with its own investigation. *See* Att. 3; Hr'g. Tr. 223:19-21.

86.     Wiley interviewed Ford, Elliott, and another assistant football coach and teacher

17

LCPS 000390

at Independence High School, Patrick Nufable, on July 14, 2022 and July 13, 2022, respectively. Ex. 10 at 4 (LCPS00006).

87.     Wiley interviewed Elliott "to verify Day's allegation." Ex. 10 at 6 (LCPS00008).

88.     Elliott recalled to Wiley that in February 2022, Day had reported to him concerns that unauthorized vehicles were parked in staff parking spaces. *Id.*

89.     Elliott explained that through inquiry and by reviewing school surveillance video, he identified G███ as parking in the staff parking spaces. *Id.*

90.     Elliott spoke with G███ while she was in the football coach's office. Hr'g. Tr. 96: 20-22.

91.     He explained that G███ took responsibility for parking in staff parking spaces. *Id.*

92.     Elliott stated that no disciplinary action was taken against G███ *Id. See also* Hr'g. Tr. 98: 17-22.

93.     Elliott stated that he did not disclose to G███ that Day had made the complaint about the unauthorized vehicles in staff parking spaces. *See* Ex. 10 at 6; Hr'g. Tr. 104:10-13.

94.     An email produced by Day during the hearing of this matter reflect that Day initially raised his complaint about the staff parking on February 23, 2022. *See* Att. 8 (also admitted into evidence as Day's Exhibit 19).

95.     In the email of February 23, 2022, Day included pictures of several vehicles. *Id.*

96.     Day's February 23, 2022 email does not identify any of the vehicles as belonging to any particular individual. *See id.*

97.     Nor does this email identify or mention G███ or K███ *See id.*

98.     Elliott stated he would look into the matter, Att. 8, which he did. Hr'g. Tr. 89:2-7.

18

LCPS 000391

99.    Day submitted a second email on March 9, 2023. *See* Att. 9 (admitted into evidence as Day's Exhibit 20); Hr'g. Tr. 89:10.

100.    Akin to the February 25, 2022 email, Day's email of March 9, 2023 included pictures of several vehicles. Att. 9; Hr'g. Tr. 89:11-16.

101.    None of the pictures of vehicles incorporated in the February 25, 2023 vehicles were identical to the pictures of the vehicles incorporated in the March 9, 2023 vehicles, *see id.*; nor are any of the vehicles' license plate numbers, *id.*

102.    Elliott does not recall that K████'s was one of the individuals who had parked in any of the staff parking spaces. *See* Hr'g. Tr. 93:4-8.

103.    G████ was never reported for parking in staff spaces after Elliott spoke with her. Hr'g. Tr. 97:9-12.

### G. Wiley Determines, Based on a Preponderance of the Evidence, Day Had Violated School Board Policies 7014 and 7560 along with Regulation 7560 and Recommends That the Superintendent Propose Day's Dismissal From Employment With LCPS.

104.    In considering whether it was more likely than not that Day had engaged in the conduct reported by the Students and had therefore violated School Board Policy 7014 and School Board Policy and Regulation 7560, Wiley considered the witnesses' credibility. Hr'g. Tr. 243:5-12.

105.    In assessing the Students' credibility, she recognized the Students' statements were consistent. Hr'g. Tr. 243:5-12.

106.    On September 22, 2022, LCPS notified Day that it had completed its investigation and that HRTD had determined Day had violated School Board Policy 7014 *Environments Free from Harassment, Discrimination, and Abuse* and School Board Policy 7560 *Professional Conduct.* Day Ex. 14.

19

LCPS 000392

107.    The notice informed Day that "[i]nformation regarding his employment status w[ould] be forthcoming." *Id.*

108.    On February 21, 2023, the Acting Superintendent executed the Notice of Proposed Dismissal recommending that Day be dismissed from his teacher position with LCPS.

109.    At the time, CPS had not yet issued any finding as to its investigation. Day Ex. 18.

110.    On May 1, 2023, CPS issued a notice to Day advising him that CPS had determined the Students' report to be unfounded. *Id.*

111.    Throughout this process and to date, Day has remained on paid administrative leave. *See* Att. 24 at LCPS000083 (included in LCPS's proposed hearing exhibits to be admitted into evidence).

112.    Day timely requested a hearing, which HRTD scheduled before a hearing officer on May 11, 2023. *See* Att. 6.

113.    Because of issues with the readability of Day's executed copy of the Hearing Officer Agreement and opposing counsel's failure to promptly cure the issue, the hearing was ultimately rescheduled for October 19, 2023. *See* Att. 6

114.    Among the reasons for this October hearing date was witness availability with schools closed and licensed staff off for the summer, and the participants' and Hearing Officer's availability. *See, e.g.*, Ex. 25.

115.    In September, 2023, the parties were notified that the assigned hearing officer would no longer be conducting hearings. HRTD therefore identified His Honor as a hearing officer and worked to ensure the hearing proceeded on October 19, 2023 as scheduled. *See* Att. 6.

LCPS 000393

## CONCLUSIONS OF LAW

The Superintendent respectfully submits that for the reasons below, the Superintendent appropriately recommended Day's dismissal from the School Division's employment for just cause and as authorized by the Virginia Code. Moreover, the Superintendent disputes any notion that the hearing of this matter is untimely or that it unfairly prejudices Day.

### A. Consistent with School Board Policy, the Superintendent Appropriately Recommended Day's Dismissal for Just Cause and As Authorized by Title 22.1 of the Virginia Code.

Section 22.1-307 of the Virginia Code provides, in part, that "Teachers may be dismissed for incompetency, immorality, noncompliance with school laws and regulations, disability as shown by competent medical evidence when in compliance with federal law, conviction of a felony or a crime of moral turpitude, or other good and just cause." Va. Code § 22.1-70 makes clear that division superintendents, such as in this case, "shall perform such other duties as may be prescribed by the law, by the school board, and by the State Board." Consistent with these statutory provisions, School Board Policy 3120 *Powers and Duties of the Superintendent* states, "The Division Superintendent must . . . recommend actions to the School Board[.]" Att. 10 ¶ A. To that end, School Board Policy 7018(C)(2) describes the procedure for which the Superintendent may recommend dismissal of a teacher. Att. 10.

It is well-settled that school boards have wide discretion in deciding whether to continue employment of their personnel. Discretion, however, means exercise of judgment, not bias or capriciousness. Thus, such a decision must be based upon fact and supported by reasoned analysis. For example, courts

> will not substitute [their] judgment for that of the public body or officer, but rather must decide whether the determination of the school board should be set aside either because it had no basis in fact [citation omitted], or because it was arbitrary and capricious [citation omitted], or because it constituted an abuse of discretion [citation omitted]. Where there is a rational legal and factual basis for

21

LCPS 000394

a school board's administrative determination, the Court will not overturn such decision and substitute its own judgment even if it would have reached a contrary conclusion [citation omitted].

*Luckett v. City of Harrisonburg Sch. Bd.*, 14 Va. Cir. 76, 82-83 (Cir. Ct. Rockingham Cty.1981).

*See also, e.g., Gwathmey v. Atkinson*, 447 F. Supp. 1113 (E.D. Va. 1976) (decided under prior law). Indeed, the court in *Stone v. Bedford County Sch. Bd.* acknowledged:

> As the Supreme Court of Virginia said in *County School Board v. McConnell*, 215 Va. 603, 212 S.E.2d 264 (1975) (a case inapposite on its facts):

>> The great weight of authority is to the effect that the decision of a school board will not be disturbed by the courts unless the board acted in bad faith arbitrarily, capriciously, or in abuse of its discretion, or there is no substantial evidence to sustain its Action.

> The court, in *White v. Board of Education, Union Free Sch. Dist., supra*, aptly stated:

>> The Court will not substitute its judgment for that of the public body or officer, but rather must decide whether the determination of the school board should be set aside either because it had no basis in fact [citation omitted], or because it was arbitrary and capricious [citation omitted], or because it constituted [*15] an abuse of discretion [citation omitted]. Where there is a rational legal and factual basis for a school board's administrative determination, the Court will not overturn such decision and substitute its own judgment even if it would have reached a contrary conclusion. [Citations omitted] 215 Va. at 607.

> In *Gwathmey v. Atkinson*, 447 F. Supp. 1113 (E.D. Va. 1976), the federal district court said in a case not applicable on its facts:

>> For sound policy reasons courts are loath to intrude upon the internal affairs of local school authorities in such matters as teacher incompetency. School boards, as well as other administrative agencies, should have wide discretion in deciding whether or not to continue employment of their personnel. Discretion, however, means exercise of judgment, not bias or capriciousness. Thus, such a decision must be based upon fact and supported by reasoned analysis. 447 F. Supp. at 1117 (Citations omitted).

*Stone v. Bedford County Sch. Bd.*, (No number in original), 9 Va. Cir. 46, 1981 Va. Cir. LEXIS 30, *1 at *13-*16 (Cir. Ct. Bedford Cty. Dec. 21, 1981).

22

LCPS 000395

Here, the Superintendent reviewed the investigation report Wiley had prepared and

weighed all evidence relied upon before arriving at the decision to recommend Day's dismissal.

He considered the statements made by each of the student and adult witnesses along with the

Students' witness statements themselves. He also considered the School Board policies that had

been violated, including their missives that

- with respect to School Board Policy 7014 *Environments Free from Harassment, Discrimination, and Abuse*:

    o "The Loudoun County Public Schools is committed to maintaining a working and educational environment for employees and students which provides for fair and equitable treatment free from harassment and discrimination, including freedom from sex discrimination and sexual harassment. The purpose of this policy is to establish a method for resolving complaints arising from alleged sexual harassment and harassment or discrimination", *see* School Board Policy 7014;
    o "Additionally, abusive behavior (as defined in Part II) that interferes with the work or educational environment is prohibited by this policy", *see id.*;
    o "Conduct which may constitute harassment or discrimination may include but are not limited to the following if based on race, national origin, ancestry, color, sex, sexual orientation, perceived sexual orientation, gender identity, pregnancy, childbirth or related medical condition, marital status, age, religion, disability, genetic information, or veteran status: . . . . (v) physical or verbal conduct when the conduct: (a) creates an intimidating, hostile, or offensive working or educational environment; (b) substantially or unreasonably interferes with an individual's work or education; or (c) otherwise is sufficiently serious to limit an individual's employment or educational opportunities", *see id.*;
    o "No individual shall discriminate on the basis of sex or harass an employee or student by making unwelcome sexual advances or requests for sexual favors or engaging in other verbal or physical conduct of a sexual nature, including the following: . . . (c) Sexual slurs, leering, epithets, threats, verbal abuse, derogatory comments or sexually degrading descriptions; (d) Graphic comments about a person's body; (e) Jokes, pictures, drawings, notes, social media communications, or gestures of a sexual nature; . . . . (i) Engaging in sexualized dialogue with students; [and] (j) Making suggestive comments to students or in the known presence of students", *id.*;

- with respect to School Board Policy and Regulation 7560 *Professional Conduct*:

    o "The Loudoun County School Board expects all staff, as public employees, to recognize that they are in a position of public trust and are

23

LCPS 000396

held to the highest standard of personal and professional conduct, serving as role models, influencing and shaping young lives, and representing the school division";

o "It is the policy of the School Board to promote and foster work and educational environments that demonstrate the principles of respect, professionalism, civility, and inclusivity";

o "Employees are expected to perform all assigned job duties in accordance with performance standards and job-specific requirements (to include attendance-related policies, procedures, and guidelines). Employees are expected to conduct themselves professionally, to treat all individuals with dignity, respect, and civility, and to demonstrate a commitment to an inclusive, safe and supportive work and educational environment where individuals from division";

o "Loudoun County Public Schools rejects behavior and language that denigrates or demeans individuals on the basis of actual or perceived race, national origin, ancestry, color, sex, sexual orientation, gender identity, pregnancy, childbirth or related medical conditions, marital status, age, religion, disability, genetic information, veteran status or any basis protected by law, recognizing that such behavior and language encourages discrimination, hatred, oppression, and violence";

o "Employees are expected to establish and maintain appropriate physical, social and emotional boundaries with students";

o "All forms of contact and communication with students must be transparent, accessible to supervisors and parents, nonsexual, unambiguous in meaning, and professional in reference and content";

o Employees are expected to conduct themselves professionally and model moral, ethical, legal and respectful behaviors both in and outside the workplace. Employees are expected to work collegially and collaboratively with all school personnel and stakeholders. Unacceptable behavior may include but is not limited to: . . . Use of disrespectful, discourteous, uncivil, disparaging, or demeaning words, gestures, or actions", School Board Regulation 7560;

o "Harassing or discriminatory comments or conduct, including speech or other telephone, electronic, or social media communication that is motivated in whole, or in part—or is reasonably perceived as motivated— by a bias due to an individual's race, national origin, ancestry, color, sex, sexual orientation, perceived sexual orientation, gender identity, marital status, age, religion, disability, genetic information, or veteran status, pregnancy, childbirth or related medical conditions, including lactation, and contrary to or not conducive to an inclusive, safe and supportive work and educational environment", *id.*;

o "The boundary of the employee-student relationship must be maintained at all times. Examples of behaviors that may constitute an inappropriate or intimate social relationship or communication with a student may include, but are not limited to: a. Conversations and comments of an intimate, romantic or sexual nature; b. Commentary on a student's physical

24

LCPS 000397

> appearance or clothing that could reasonably be interpreted as sexual, flirtatious or harassing", *id.*

Based on the Superintendent's application of school policy to the facts and findings summarized in the investigative report, the Superintendent determined Day had violated School Board Policies 7014 and 7560 and Regulation 7560.

Day has not provided any evidence that rebuts the School Divisions' personnel decision relative to his conduct. His mere disagreement with the decision is not sufficient to overturn the Superintendent's sound basis for recommending his dismissal without cause.

For these reasons, the Superintendent lawfully recommended Day's dismissal for violating School Board policy. His recommendation should be upheld.

## B. Wiley's Investigation Supported a Finding of Just Cause to Recommend Day's Dismissal.

Day contends that Wiley inappropriately relied on evidence to support a finding that her investigation did not sufficiently support the facts leading to his recommended dismissal. However, Day has offered little more than his own conclusory, self-supporting statements and contentions.

As the investigator who interviewed the witnesses closer in time to the events in this matter, Wiley considered the credibility of each witness, including Day's. She found that Day's statements in total were not as credible. For instance, he responded that he did not recall several of the statements he was accused of making. When asked several times if he had anything he wanted to add, Day used the opportunity to ask questions about, for example, the impact on his evaluation cycle. He did not identify any individuals who could help refute his claims. And he never submitted any evidence in support of his assertions.

On the contrary, the Students each made statements that were consistent and corroborated by adult witnesses who otherwise were colleagues and coaching peers of Day. Ford overheard at

25

LCPS 000398

least one statement Day made to the Students. Additionally, Windows and Ford recalled the Students confiding in them about their concerns regarding Day's comments and its impact on the Students. Considering this and the other documentary evidence provided during the course of this investigation, Wiley arrived at the determination that it was more likely than not Day engaged in conduct that violated School Board Policies 7014 and 7560 along with School Board Regulation 7560.

Day makes the claim that with additional documentation (without identifying what it could be in a case that primarily hinged on statements of the reporting Students, Day himself, and other witnesses who heard the statements), this investigation could have been conducted more thoroughly, something that Wiley acknowledges might be true. This Monday-morning quarterback of a proposition can be said about any investigation: with additional resources and time, any investigation could be conducted more thoroughly. In this case, Wiley conducted a full investigation within the reasonable parameters afforded. She had to consider and, for a time, yield to a corresponding investigation by CPS, while at the same time conducting this investigation as confidentially and promptly as reasonably appropriate.

In any event. Day's efforts to discredit the investigation disregards that Wiley considered evidence that erred in Day's favor, such as his outright denials of certain statements, as well as that two of his football coach peers admitted that they had overheard Day make at least one remark to the Students that violates School Board Policies 7014 and 7560.[6] He also fails to acknowledge that Wiley investigated Day's contention that the Students reported him for misconduct after he complained that they were parking in staff parking spaces. Unfortunately for

---

[6] Day's argument seems directed mainly at Ford. As reflected in Virginia Code 16.2-1509 and the interagency agreement between CPS and LCPS, Ford elevated these reports to his head coach, Windows.

26

LCPS 000399

Day, the evidence Wiley uncovered -- and which was presented at the hearing on this matter – actually refuted Day's claims: the School Security Officer promptly conducted his own inquiry into the matter and through that, identified the individuals who had parked in unauthorized spaces; the School Security Officer specifically spoke to G███ because she had done so; the School Security Officer never disclosed who had made the report; there was no evidence that K███ had been reported by Day; and neither G███ nor K███ had been disciplined. In fact, G███ was never reported as parking there again, nor were any of the vehicles on Day's two emails on the matter a match. With the facts in mind, Day's arguments are misleading and should not be permitted to cast a net of invalidity or incompetency on Wiley's investigative findings or on the manner and conduct of her investigation.

## C. The Investigation Was Conducted As Promptly As Appropriate Given the Circumstances, and None of the Evidence is Barred by any Statute of Limitations or School Board Policy.

During his hearing, Day contended that any conduct occurring prior to two years from the date of the Recommendation for Dismissal is barred by Virginia's statutes of limitations contained in Chapter 4 of Title 8.01 *Civil Remedies and Procedure* of the Code of Virginia. However, his argument is disingenuous and effectively fails because these statutes of limitations, which he seeks to apply, only apply to *actions* and *suits*, and not to this administrative proceeding falling entirely within the bounds of Chapter 15 of Title 22.1 of the Code of Virginia. To that end, Section 8.01-2 makes clear: As used in this title, unless context otherwise requires, the term: 1. 'Action' or 'suit' may be used interchangeably and shall include all civil proceedings whether upon claims at law, in equity, or statutory in nature and whether in circuit courts or district courts".

With regard to his claims that Wiley "blew" the deadline applicable to Title IX actions, Day's argument also fails; nowhere in the Title IX of the Education Amendments Act or its

21

implementing regulations is there a deadline by which an investigator must complete a Title IX investigation. Were this the case, nearly every harassment action would be time-barred, as these actions typically span lengthy periods of time, require the interviewing of several witnesses, and necessitate reviews of institutional practices and policies. To the contrary, Title IX's implementing regulations only require that the grievance process include reasonably prompt time frames for the conclusion of the grievance process, https://www.ecfr.gov/current/title-34/subtitle-B/chapter-I/part-106. Therefore, Day's arguments that Wiley only investigated this matter for violations of Policy 7014 and Policy and Regulation 7560 violations after she missed her deadline for complying with Title IX are misleading and false.

The same is true for Day's arguments that Wiley illegally investigated this matter jointly with CPS, or that she did not complete this investigation as soon as practicable, given the circumstances. Va. Code 63.2-1511 makes clear that CPS and LCPS could enter an interagency agreement regarding the investigations of such matter. Wiley testified that such an agreement exists between CPS and LCPS, and that she conducted the investigation in accordance with that agreement. Documentation admitted into evidence, including Day's own finding letter, demonstrate that CPS did not, for whatever its reason, complete the investigation within their statutory timeframe. After it became clear that CPS would not complete its investigation in a timely manner, to prevent any further delay, Wiley moved forward with the investigation with which she was charged. Given these circumstances, the investigation completed as promptly as practicable.

### D. LCPS REQUESTS HOLDING THE HEARING OPEN TO ADMIT EVIDENCE PREVIOUSLY EXCLUDED IN LIMINE.

During the hearing, Day alleged that Wiley (and several other witnesses) lied in connection with the investigation. With regard to Wiley, Day contended that she lied in

28

LCPS 000401

conducting the procedural aspects of the investigation, and that she engaged in illegal activity by jointly investigating the matter with CPS. These arguments calling into question Wiley's truthfulness and competency strike at the heart of the investigation, which is front and center in this dismissal hearing, given that it supports the recommendation of dismissal. Moreover, rules of evidence are not strictly applied to administrative proceedings such as this one, where the procedures are prescribed explicitly in Virginia Code's grievance procedure applicable to licensed teachers. *See* Va. Code § 22.1-309 *et seq.* To issue the harsh measure of precluding testimony that, inter alia help the Hearing Officer understand how Wiley conducted her process and arrived at her determination and recommendations (and is not admitted for the truth of the matter asserted) meaningfully deny the School Board an opportunity to demonstrate why its recommendation for dismissal is supported by just cause, as required by Virginia law. The School Board respectfully requests reconsideration of the Hearing Officer's highly prejudicial ruling and hold the hearing open for the limited issue of permitting testimony on how Wiley arrived at her conclusions.

## CONCLUSION

Wherefore, for the reasons stated above, as well as for those provided at the hearing of this matter, and for such other good cause shown, Superintendent Aaron Spence respectfully requests that the recommendation for Day's termination of employment with Loudoun County Public Schools be sustained and that such other relief deemed just and appropriated be granted.

Dated:  October 27, 2023                    Respectfully submitted,

                                            Aaron Spence, Ed.D., Superintendent
                                            Lisa Boland, Superintendent's Designee

29

LCPS 000402

/s/ *Kristi L. Johnson*
Kristi L. Johnson
Associate Counsel
Loudoun County Public Schools
21000 Education Court
Ashburn, Virginia 20148
Phone: (571) 252-1000
Email: Kristi.johnson@lcps.org
*By Counsel*

30

LCPS 000403

# DEFENDANT BRIAN DAY'S PROPOSED

# FINDINGS OF FACT AND CONCLUSIONS OF

# LAW

LCPS 000404

October 27, 2023

<u>**Via Email and US Mail**</u>

Ian Serotkin, Chairman
Loudoun County School Board
c/o Kristi L. Johnson, Esq.
Associate Counsel
2100 Education Court
Ashburn, Virginia 20148
Kristi.Johnson@lcps.org

> Re: Findings of Fact, Conclusions of Law, and Proposed Recommendation
>
> Loudoun County Public Schools / Brian B. Day
>
> Grievance Appeal: 2023000426

Dear Mr. Serotkin:

Brian B. Day ("Day"), a physical education teacher and football coach at Independence High School, filed a timely appeal of the Superintendent's recommendation for his dismissal from employment. The undersigned, Hon. William T. Newman, Jr. was appointed by the Loudoun County School Board ("School Board" or "LCPS") to preside over a hearing in this matter pursuant to Loudoun County Public School Board Policy § 7-4, Procedure for Adjusting Grievances, Virginia Code § 22.1-308, and Virginia Administrative Code 8VAC20-90-30.

The hearing commenced on October 19, 2023 at 21000 Education Court, Ashburn, Virginia, 20132. The numbers referenced in this Letter Opinion refer to the parties' admitted exhibits.

### A. Preliminary Motions

#### i. Plea to the Statute of Limitations

Day made a plea of the statute of limitations, arguing that there were no dates provided by LCPS on which any of the alleged conduct occurred. Day argued that, having no dates, LCPS could not reasonably conclude or establish that any of the alleged conduct occurred after February 15, 2021, which is two years prior to the February 15, 2023 notice of proposed dismissal. The plea was taken under advisement.

#### ii. Title IX Non-Compliance

Day moved to dismiss the notice of proposed termination and for a decision in Day's favor pursuant to LCPS's grievance policy 7018 (Day Exhibit 6) due to LCPS's failure to comply with the substantial procedural requirements of policy 7018 and its applicable statutory counterparts. Pursuant to the grievance policy 7018, "the failure of the School Board...to comply with all substantial procedural requirements without just cause shall entitle the grievant, at his option...at the final step, to a decision in his favor." (Day Ex. 6) The hearing was the final step, so Day moved for a decision in his favor.

Day argued that LCPS did not provide any evidence that a Title IX investigation was completed within 30 working days (Ex. 6, p. 5), that a determination as to whether the complaint was founded or unfounded was made within 15 working days thereafter, or that Day was notified

**LCPS 000405**

of the resolution 6/2017 working day thereafter. *Id.* There was no documentation provided to Day that any Title IX investigation occurred at all, despite LCPS placing Day on notice of the potential violation. (Day Ex. 10,

Day argued that as there was no finding of a Title IX violation, he was entitled to a decision in his favor for LCPS's failure to comply with the substantial procedural requirements of the Title IX policy. Because of the failure to substantially meet the procedural requirements with regard to Title IX, LCPS was estopped from going forward, on the same allegations for an independent policy 7014 violation. The motion was taken under advisement.

### iii. Policy 7014 Non-Compliance

Day also moved to dismiss the case for LCPS's failure to comply with its own investigative standards outline in Policy 7014 (Day Ex. 5) regarding any investigation being completed within 30 working days "or as soon as practicable" as there was no documentation provided to Day of any good cause as to why, despite Day being placed on leave on March 31, 2022, LCPS failed to complete its investigation into the allegations made against Day by April 30, 2022. (Day Ex. 9) Documentation evidenced that the investigation was not complete until July 26, 2022, (LCPS Ex. 10) the findings relayed to Day on September 22, 2022, (Day Ex. 14) and the Notice of Proposed Dismissal signed on February 15, 2023, well outside the timeframe outlined in policy 7014. (Day Ex. 15) The motion was taken under advisement.

### B. Incidents of the Hearing

Day asked for a rule on witnesses, which was granted.

Day also objected to the introduction of any hearsay testimony, as it violated his constitutionally-guaranteed right to due process, specifically his right to confront witnesses against him. The hearing officer indicated he would consider this argument in the weight afforded specific testimony.

Day made a motion *in limine*, requesting that all testimony and evidence be limited to the reasons stated in the reasons for proposed termination letter, (Day Exhibit 17) which states "allegations reported to the Department of Human Resources and Talent Development that you made inappropriate comments of a sexual nature to multiple female students were investigated and substantiated. Your actions violated School Board Policy 7560—Professional Conduct; and Policy 7014—Environments Free from Harassment, Discrimination." This motion was granted.

### I. Findings of Fact

1. Day is a Loudoun County Public School continuing contract teacher, having begun employment with Loudoun County Public Schools on or about September 8, 2015.

2. In 2020, Day transferred from Riverside High School to Independence High School.

3. During the time period relative to his proposed termination, in addition to being a physical education teacher, Day was also an assistant varsity football coach under head coach RJ Windows.

4. The Superintendent called four witnesses in support of Day's proposed termination: Independence High School SSO Brian Elliot, Independence High School Principal John Gabriel, Independence High School counselor Laura Northart, and HRTD investigator Angel Wiley. Notably, the Superintendent did not call any witness with personal knowledge or the purported complainants, K███ R██ ("R███") and G███ L███ ("L███"). LCPS did not present either complainant for cross-examination, or provide any hearsay testimony under oath.

5. Notably, as a matter of fact, Day was not able to cross-examine either complainant.

6. Neither of Day's accusers, R███ and L███, testified at the hearing.

LCPS 000406

7. In opposition to the Superintendent's recommendation for termination, counsel for Day cross-examined the LCPS witnesses and proffered Day's testimony.

8. Brian Elliot stated he had a pleasant relationship with Day. Elliot testified that in his capacity as safety and security officer at Independence High School, he responds to staff concerns regarding parking. This included Day's February 23, 2022 email and photos of students parking in the staff lot (Day Ex. 19) and Day's follow-up email and photos dated March 9, 2022. (Day Ex. 20). Day's emails were admitted.

9. Elliot testified that he was certain one of the vehicles impermissibly parked in the staff lot belonged to L█████ (a black Jeep) and believed that another vehicle, a white Volvo, belonged to R███. Day Ex. 19, Bates 088.

10. Elliot further testified that he was able to track down some of the students parking in the staff lot and spoke to them. Elliot stated he spoke with L█████ and R███ regarding not parking in staff spaces while in head coach R.J. Windows' office. No investigation was undertaken to identify the other students.

11. Elliot stated that L█████ and R███ were the female managers of the varsity football team.

12. Elliot did not speak to the LCSP investigator regarding the allegations made by R███ and L█████ and against Day until July 13, 2022, three months and 13 days after the accusers made their report on March 31, 2022. The investigator provided no reason why she could not have spoken to Mr. Elliot within the time frame necessary to conclude her investigation within 30 days.

13. Elliot had no knowledge regarding the allegations made against Day.

14. John Gabriel testified that he initially interviewed Day for a position at Independence High School as a physical education teacher and football coach.

15. Gabriel testified that neither L█████ nor R███ ever received punitive consequences for the parking issue. Neither L█████ nor R███ were ever investigated regarding truthfulness.

16. Gabriel stated that he was aware that L█████ had mental health issues, and that she was seeing the school counselor for those concerns.

17. Gabriel acknowledged that all of his teachers and staff are mandatory child abuse reporters. He further testified that at no time, let alone between February 15, 2021 and March 31, 2022, did any mandatory reporter, or student, made a complaint regarding Day's alleged interactions with R███ and L█████

18. Gabriel did not have any first-hand knowledge regarding R███'s and L█████'s allegations against Day. Gabriel never had any conversations with any individual or investigator regarding the nature of the alleged evidence against Day.

LCPS 000407



19. No witness was able to give an alleged date, or date range, for any of the alleged accusations against Day. No witness could provide direct evidence in support of hearsay allegations.

20. All witnesses confirmed that neither R███ nor L███ ever reported any concerns with Day's behavior to Independence High School Administrators prior to March 31, 2022, despite their hearsay allegations of conduct occurring over the past several years.

21. No adult teacher and/or administrator reported any concerns regarding Day's behavior towards R███ or L███ to school administration and/or CPS.

22. Laura Northart testified that she was a school counselor at Independence High School on March 31, 2022. She stated that R███ and L███ came to the counseling office together on March 31, 2022, and she gave them forms on which to hand write their allegations against Day. Northart could not confirm if she placed the girls in separate rooms while they wrote their statements. Northart did not undertake any investigation to corroborate the hearsay allegations.

23. Northart did not make the referral to CPS. Northart stated that her supervisor, Jacqueline Smith, who did not testify, made the referral over the phone per LCPS policy. Northart did not know why the date on the CPS referral was listed as March 22, 2022, which was different from March 31, 2022. Northart confirmed that R███ and L███ reported their concerns with Day's behavior on March 31, 2022. Northart testified that she did not even see the CPS referral until the Fall of 2023, when it was sent to her the week before Day's grievance hearing, in preparation for Day's grievance hearing.

24. Northart stated she did not participate in the investigation of L███'s and R███'s allegations against Day, and she had no first-hand knowledge regarding the allegations. Northart said her last interaction with L███ and R███ regarding this matter was on March 31, 2022. Northart's credibility was brought into question because although she claimed no interaction with L███ and R███ after March 31, 2022, the investigator, Angel Wiley, testified, and stated in her report, that Northart was present for both girls' interviews on April 5, 2022.

25. The Loudoun County Child Protective Services referral returned unfounded. (Day Ex. 18)

26. LCPS called Angel Wiley, the HRTD equity/compliance investigator as a witness. Wiley testified that she was the investigator regarding R███'s and L███'s complaint against Day, and she became aware of that complaint on March 31, 2022.

27. Wiley testified that neither complainant nor anyone subject to interview was ever placed under oath.

28. Wiley had no knowledge of any complaint made by R███ and L███ prior to March 31, 2022, and stated that March 31, 2022 was the first report of the alleged conduct by Day involving R███ and L███

29. Wiley testified that she worked jointly with CPS caseworker Brenda De Haas pursuant to a "MOU," but was unsure of the "MOU"'s specifics. The "MOU" was not produced in evidence. Wiley stated that it was her supervisor, Alix Smith, who made the decision to coordinate the investigation with CPS. Wiley also said that LCPS sometime works in conjunction with CPS so that alleged victims do not have to re-hash their allegations multiple times. Wiley provided no authority for LCPS to abandon its policies and the deadlines contained therein in order to work with CPS.

LCPS 000408

30. Wiley testified that the "gap" between the CPS referral initiated on March 31, 2022 and the ultimate result of "unfounded" on May 1, 2023, more than 14 months later, (Day Ex. 18) was because CPS switched caseworkers.

31. Wiley confirmed that nothing prevented her from interviewing the individuals listed in her investigative report within 30 days of March 31, 2022, or completing her investigation as required by Policy 7014, 7018 and the Title IX policy. She identified no good cause for acting outside the deadlines established in the policies.

32. Wiley acknowledged that she was not truthful when she told Day in his interview that "I have to wait for CPS to close their case before I can even really start my case." (Day. Ex. 22, p. 33)

33. Although R███'s and L███'s written hearsay complaints asserted they informed other students of their concerns, Wiley stated that she did not interview any student to confirm or deny R███'s and L███s allegations, although nothing prevented her from doing so. No other students corroborated the complainants' hearsay statements.

34. Wiley admitted that although she had recorded all conversations she had with individuals referenced in her report, and had those conversations transcribed, she did not provide those transcriptions and/or recordings to Day or his counsel.

35. No adult is alleged to have overheard and/or confirmed any statement made by R███ and/or L███, and no adult contemporaneously reported any statements to the school system, or to Loudoun County Child Protective Services, as they were required to do as mandatory reporters.

36. The investigator, Angel Wiley, made unsupported inferences with regard to Day's answers to her interview questions and utilized an interview technique designed to entrap Day or permit misconstruing of his answers.

37. For example, a transcript of the May 17, 2022 was tendered to the hearing officer. (Day Ex. 22) The transcript demonstrates that questions were asked in a specific manner to elicit a response that was then improperly used to support the investigator's conclusion of Day's culpability. When the investigator asked if Day recalled something, he responded in the negative, that he did not recall said incident. For example,

Ms. Wiley: You don't recall the conversation at all?

Day: I don't recall the conversation at all.

Trans. P. 12

Ms. Wiley: Can you talk to me a little bit about that specific allegation?

Day: I cannot.

Ms. Wiley: You don't recall?

Day: I don't recall. It doesn't sound like something I would say.

LCPS 000409

Trans. P. 15.

Ms. Wiley: Can you speak to that specific allegation?

Day: No, I cannot. It's not something I would say.

Trans. P. 17.

The investigator then used Day's answers that were directly responsive to her questions to conclude that Day was not credible, stating that it "it is reasonable to expect a response of "no" or "yes" when asked such outrageous and objectionably [sic] offensive questions." The investigator's expectations are not based on anything other than her personal preference. This unsupported conclusion was reached despite the investigator specifically asking Day "if he recalled."

38. There was no corroborated evidence presented by LCPS suggesting Day engaged in inappropriate behavior with students, and no evidence that Day violated the professional conduct policy and/or the harassment and discrimination policy.

39. The Acting Division Superintendent, when required to identify the reasons for the dismissal recommendation, merely gave the conclusory statement that Day "made inappropriate comments of a sexual nature" without further elaboration or detail. (Day Ex. 17)

40. When interviewed as part of the investigation, Day credibly denied all accusations. The investigator's report recounted the following denials:

| Question | Answer |
| --- | --- |
| Did Day recall making inappropriate or insensitive comments to female students? | Not to my recollection. |
| Would it be characteristic of him to make insensitive comments? | Very uncharacteristic. |
| Did Day recall commenting that a student would "fuck around with all of the D1 athletes?" | Could not speak to that conversation, it is not something that I would say. |
| Did Day recall commenting that a female would or had fucked the whole football team. | Never. |
| Did Day recall commenting to a student that "you are always on your knees" | Did not recollect a conversation of that nature and that he did not make that statement. |
| Did Day ever comment that a student was looking whorey, or insinuated that students looked like whores. | That is not something I would say, and I don't have any recollection of it. |
| Did Day ever make comments about the football managers clothing being too skimpy? | I don't recall. It doesn't sound like something I would say. |
| Did Day recall discussing swingers or pineapple shorts with students. | Day stated the pineapple "is a symbol of swingers, but I don't not recollect a conversation about the shorts." |
| Did Day ever state that if he were in high | Day stated that he had no recollection of |

LCPS 000410

Did Day recall a conversation in which he
stated that he would buy a student gifts from
Toys-R-Us for a baby shower.

Day stated I do not recall.

Did Day recall stating that guys would use
LaBell for her body.

Day stated "I don't recall."

41. There is no corroboration or witnesses to any of the specific actions alleged to be taken by Day by the complainants' hearsay complaints.

42. Counsel for Day proffered that Day's testimony would be a complete denial of all allegations made by R███ and L███, as listed in R█'s and L███'s written hearsay statements. (LCPS 10, Ex. A) The statements were objected to as hearsay and that consideration of them denied Day his right of confrontation of witnesses against him. Counsel for LCPS accepted the proffer, and did not cross-examine Day.

43. Day was unable to confront the two complainants who brought the alleged accusations. This alone causes the undersigned hearing officer to have concern for Day's due process rights as he has been denied his right to confront his accusers, as will be more fully developed in Section III, *infra*. See *Grimes v. Nottoway County School Board*, 462 F.2d 650 (4th Cir. 1972) The delay in processing this grievance (with Day being on administrative leave since March 31, 2022, almost 19 months) also renders this matter stale.

44. Post-hearing, the Superintendent attempted to improperly augment the record by including irrelevant and immaterial exhibits, and other exhibits, all of which were either not provided to Day or ruled as inadmissible.

## II. Conclusions of Law

This hearing officer is entitled to administer oaths and affirmations; receive probative evidence; exclude irrelevant, immaterial, insubstantial, privileged, or repetitive proofs, rebuttal, or cross-examination; rule upon offers of proof; and oversee a verbatim recording of the evidence; hold conferences for the settlement or simplification of issues by consent; dispose of procedural requests; and regulate and expedite the course of the hearing.

As Day is a continuing contract teacher, the Superintendent carries the burden of showing by a preponderance of the evidence that Day should be terminated for "noncompliance with school laws and regulations." See Va. Code § 22.1-307.

As a matter of law, Day who enjoys a continuing contract, has a property interest under state law not to have his employment dismissed without due process. Virginia Code § 22.1-304; *Wilkinson v. School Bd. Of County of Henrico*, 566 F. Supp. 766 (E.D. Virginia 1983). Consequently, this hearing officer must evaluate the evidence in the context of a denial of due process resulting in a deprivation of Day's property interest. Due process, as guaranteed under the 14th amendment, is implicated.

The term "just cause" is not defined in the statute, however, similar statutes and collective bargaining agreements routinely refer to "cause" or "just cause" as the standard to be applied by arbitrators when deciding disciplinary cases. The two standards were intended to be synonymous. See National Academy of Arbitrators, The Common Law of the Workplace, §6.1, Comment "a" (St. Antoine, editor, 2nd ed., 2005) ("Terms like 'cause,' 'good cause,' 'proper cause,' 'sufficient cause,' and so on are, unless otherwise agreed, synonyms for just cause.")

In Virginia Code § 22.1-306 et. seq, Day is entitled to basic procedural and substantive

LCPS 000411

due process in his grievance procedure. This includes reasonable notice of the nature of the proceeding and the basic law under which LCPS contemplates its possible exercise of authority, and matters of fact and law asserted by LCPS.

Day is also entitled to submit evidence, have accusers and witnesses testify under oath, cross examine witnesses, have those witnesses appear for credibility determinations by the fact-finder, and be represented by counsel. See § 22.1-308(4) and *Grimes v. Nottaway*, supra. Also, arguably, Day is entitled to have had LCPS provide him, before the hearing, information underlying the charges and the LCPS investigation such as the transcripts of the investigator's interviews. The burden of proof is LCPS's.

## A. Plea to the Statute of Limitations

As a threshold matter, LCPS has failed to show, by the preponderance of the evidence, that any of the allegations against Day were alleged to have occurred within two years of Day's notice of proposed termination. Statutes of limitations run against public corporations, whether they are municipal corporations or mere agencies of the state; such entities are governed by the same laws and regulations, and subject to the same limitations, as natural persons. See *Johnson v. Black*, 103 Va. 477, 492 (1905).

LCPS is a public corporation because it can sue in its own name and hold property in its name, and transact business, *Id.* Its enforcement of alleged violations of its regulations is subject to the applicable statute of limitations. *Id.*

LCPS did not present any evidence that the allegations against Day occurred from February 15, 2021 onward (two years' prior to the notice of proposed termination on February 15, 2023). There is no evidence of *any* specific date in the record, such that this hearing officer could credibly conclude an alleged statement was made after, as opposed to prior to, February 15, 2021. Day denies the occurrence of any event and he was not subject to cross-examination. LCPS provided no non-hearsay evidence of any improper act of Day. LCPS did not establish that any alleged act occurred after February 15, 2021. Day's plea of the statute of limitations is sustained.

## B. Day's Motions to Dismiss

Day moved to dismiss the notice of proposed termination and for a decision in Day's favor pursuant to LCPS's grievance policy 7018 (Day Exhibit 6) for LCPS's failure to comply with the substantial procedural requirements of policy 7018 and its applicable statutory counterparts, regarding the alleged complete lack of Title IX investigation and the substantially non-compliant Policy 7014 investigation.

Having received the evidence, the undersigned hearing officer finds as follows.

The procedural timeline of this grievance is:

- On March 31, 2022, two students made allegations of alleged inappropriate comments by Day. Day was placed on administrative leave, and a CPS referral issued. (Day Ex. 9)

- On April 4, 2022, Day was informed that the complaint alleged he engaged in unprofessional conduct and a potential Title IX violation. (Day Ex. 10)

- On May 17, 2022, Day was interviewed regarding the allegations. (Day Ex. 22)

- On July 26, 2022, the investigator, Angel Wiley, filed her investigative report. (LCPS Ex. 10)

- On September 22, 2022, Day was informed that the investigation was complete and the LCPS complaint determined the allegations were supported. (Day Ex. 14)

- On February 15, or 21, 2023, LCPS acting Superintendent Daniel Smith issued a notice of proposed dismissal. (Day Ex. 15)

- On February 27, 2023, Day was notified, in person of the recommendation for dismissal.

- Day timely requested a hearing on the proposed dismissal. (Day Ex. 16)

LCPS 000412

- On May 1, 2023, the Loudoun County CPS report returned unfounded.
- On October 19, 2023, Day's termination hearing occurred.

### i. Title IX Requirements

LCPS policy 7018 3. B. states, "the failure of the School Board or of any supervisory employee to comply with all substantial procedural requirements without just cause shall entitle the grievant, at his option, to advance to the next step in the procedure, or, at the final step, to a decision in his favor." Under 2 a, a Title IX compliance officer should have been assigned to review whether harassment or discrimination occurred. There is no evidence a Title IX investigation was ever opened in this matter, despite Day being notified on April 4, 2022 of a potential Title IX violation and investigation. LCPS failed to follow the procedural Title IX requirements, which entitles Day to a decision in his favor.

### ii. Policy 7014

Policy 7014, section 2. E states:

> An investigation of all reported incidents shall be undertaken promptly and shall be completed and findings provided to the Division Superintendent **within 30 working days or as soon as practicable from the filing of the complaint....The Division Superintendent shall make the determination whether the complaint is founded or unfounded, and that a violation of this policy occurred, within 15 working days of receipt of the compliance officers' recommendations** or as soon as practicable. The complainant and the individual who is **the subject of the complaint shall be notified whether the complaint was determined to be founded or unfounded within 5 working days of the determination.**

(emphasis added)

The investigator, Wiley, was cross examined regarding the timeline of her investigation. She admitted that the investigation was not completed in 30 days. She further admitted that nothing prevented her from interviewing witnesses or completing her report within the 30 day period required by LCPS policy. LCPS provided no evidence of a just cause to extend the investigation timeline. Most egregiously, Wiley admitted she lied to Day regarding the timeline of the LCPS investigation vis-a-vi the CPS investigation, in that she informed Day that she was required to wait until the CPS investigation closed.

LCPS violated its own investigation procedures. Based on the required procedures, the investigation should have been completed by April 30, 2022. This did not occur and no good cause for the failure to have this timely occur was provided. The undersigned hearing officer finds this to be a failure to comply with all the substantial procedural requirements without just cause, entitling Day a decision in his favor.

This hearing officer determines Day is entitled to a decision in his favor because LCPS violated its own procedural requirements in LCPS policy 7014, "environments free from harassment, discrimination, and abuse."

### C. Day's right to due process has been violated

The right to procedural due process is guaranteed in the Fourteenth Amendment to the United States Constitution, which provides that no person shall be deprived of life, liberty or property without due process of law. Due process claims must be addressed in a two-step inquiry. "First, there must be a deprivation of a liberty or property interest." *Klimko v. Virginia Employment Comm'n*, 216 Va. 750, 754 (1976). If there is a deprivation of a liberty or property interest, due process applies and the second step of the inquiry focuses on what process or procedures are required to satisfy the fourteenth amendment. *Id.*

A continuing contract teacher has a property right in his employment. *Corns v. School Bd.*, 249 Va. 343 (1995). The Superintendent, by proposing Day's termination, has moved to deprive Day of that property interest. The hearing officer therefore finds that due process applies.

The due process right "to call for evidence in [one's] favor" is guaranteed by the Virginia Constitution. Va. Const. art. I, § 8; see generally *Massey v. Commonwealth*, 230 Va. 436, 442 (1985); *Cremeans v. Commonwealth*, 104 Va. 860, 863 (1905). This includes the right to confrontation and cross-examination. 'Generally speaking, the Confrontation Clause guarantees

LCPS 000413

an opportunity for effective cross-examination… *Nichols v. Commonwealth,* 6 Va. App. 426, 429 (1988) (quoting *Delaware v. Van Arsdall,* 474 U.S. 13, 20 (1985)).

Courts have adamantly protected the right of confrontation with one's accusers not only in criminal cases, but also in cases where administrative and regulatory action is under scrutiny. *Greene v. McElroy,* 360 U.S. 474, 497 (1959). With respect to confrontation and cross-examination of witnesses, the Supreme Court has held that "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970)

Where the "evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealously, "a party's right to show that it is untrue depends on the rights of confrontation and cross-examination. The [Supreme Court] has thus "been zealous to protect these rights from erosion. It has spoken out not only in criminal cases… but also in all types of cases where administrative….actions were under scrutiny." *Green,* 360 U.S. at 496-97.

The requirements of due process provided by the Fifth Amendment, as made applicable to the states by and through the Fourteenth Amendment, should protect an individual in an administrative hearing by giving him the same right to confront his accusers as he would have in a criminal trial. See *Williams v. Zuckert,* 371 U.S. 531, 533-34 (1963) (dissenting opinion, majority did not reach the constitutional issue)

Day's counsel should have been permitted to expose to the hearing officer the facts from which the hearing officer, as the sole trier of fact and credibility, could appropriately draw inferences relating to the reliability of the witnesses. R███ and L███ were not produced by the Superintendent. Day had no ability to subpoena R███ and L███; and, LCPS did not produce them as witnesses. Day was thus denied the right of effective cross-examination which "'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis,* 384 U.S. 1, 3." *Smith v. Illinois,* 390 U.S. 129, 131 (1968)

Besides the right of confrontation and cross-examination, courts have also determined that failure to provide testimony under oath and failure to provide for observation of witness demeanor would necessarily amount to due process violations. See *United States v. Abu Ali,* 528 F.3d 210, 240 (4th Cir. 2008) In making this determination, the Supreme Court relied on the test used in *Maryland v. Craig,* 497 U.S. 836 (1990). First, LCPS must show that denial of face-to-face confrontation is necessary to "further an important public policy." *Id.* LCPS made no such showing. Second, LCPS must make certain that "absent face to face confrontation, the reliability of the testimony is otherwise assured." *Id. at 241.*

Citing *Craig,* this hearing officer finds that "the presence of other elements of confrontation — oath, cross-examination, and observation of the witness' demeanor," *Id.,* are lacking and that LCPS has failed to adequately ensure that the hearsay documents are reliable. Further, those hearsay documents are not corroborated and have not been subject to rigorous adversarial testing in a manner functionally equivalent to the cross-examination of live, in-person testimony," See *Id.*

Here, there was no mechanism for Day to confront or cross-examine the complainants. The hearing officer has no ability to observe the demeanor of R███ or L███ The allegations of the complainants were not taken under oath. Additionally, LCPS deliberately withheld the transcripts of the interviewees from Day. This hearing officer can conclude that those transcripts contained exculpatory information. *Green, supra.* Consequently, this hearing officer can only conclude that Day's right to due process has been violated.

## D. There is no evidence to support the Superintendent's Recommendation

Contrary to the conclusory findings in the Superintendent's investigative report, (LCPS 144-157) LCPS did not substantiate that Day participated in behaviors that do not align with the mission and policies of LCPS standards. Administrative hearing officers must base their decisions on substantial evidence. Substantial evidence is more than a mere scintilla. It requires presentation of relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See *Consolidated Edison Co. v. NLRB,* 305 U.S. 197 (1938). Mere uncorroborated hearsay or rumor does not constitute substantial evidence. *Id.* While uncorroborated hearsay may be admitted into evidence, the ultimate decision must be supported by legal, and non-hearsay substantial evidence. *Id.* In this case, there is no corroborated, non-hearsay evidence.

The Superintendent did not meet his burden of persuasion that the investigation into Day supported a finding that Day engaged in unprofessional conduct by making inappropriate statements that were sexual in nature to the complainants, in violation of School Board policies

Further, pursuant to Virg    Code § 63.2-1509 and 22VAC40-705-40, a    e adult individuals who testified at the hearing in this matter are mandated reporters. Mandated reporters shall make a report of any suspected abuse or neglect as soon as possible, but no longer than 24 hours after having reason to suspect a reportable offense. Failure to do so shall result in a fine or criminal charges. See 22VAC40-705-40.4. There is no evidence of any adult being fired or criminally charged for failure to report any allegation against Day; and, no evidence of any adult making report against Day. Based on this, this hearing officer can logically conclude that no adult has any evidence supporting a claim against Day.

Additionally, failure to report student abuse or neglect is a violation of LCPS policy 7530, and can subject the teacher or other school employee to disciplinary action up to, and including, termination. *See* Day Ex. 7. No mandated reporter reported any alleged abuse or neglect in the two-year time frame that R██ and L██ allege that Day engaged in this conduct. This alone causes the hearing officer concern regarding the credibility of the heresy written complaints.

As stated above, the CPS report of the investigation of the complainants' allegations returned "unfounded." *See* Day Ex. 18. Absent corroborated testimony under oath obtained under the rigors of cross-examination, this hearing officer can give no weight to R██ and L██s uncorroborated accusations.

### III. Proposed Recommendation

The Superintendent has the burden of showing by a preponderance of evidence that Day should be terminated for the charge of noncompliance with school laws and regulations. Va. Code § 22.1-307

The Superintendent did not act within the statute of limitations, and did not provide Day with substantial compliance with procedural regulations.

The Superintendent stated in pre-hearing correspondence and again at the hearing that Day was being terminated for the following reasons: "Allegations reported to the Department of Human Resources and Talent Development that you made inappropriate comments of a sexual nature to multiple female students were investigated and substantiated. Your actions violated School Board Policy 7560—Professional Conduct; and Policy 7014—Environments Free From Harassment, Discrimination." *See* Day Ex. 17. The Superintendent has not met his burden.

As fact-finder, this hearing officer must make credibility determinations and appropriately weigh the evidence where it is in material conflict. At the hearing of this matter, the Superintendent relied exclusively upon uncorroborated hearsay evidence provided by R██ and L██ The Superintendent did not produce the complainants so they could testify under oath and be subject to cross-examination.

Day's proffer denied the allegations of R██ and L██ and his cross examination of Brian Elliot presented a much more likely scenario regarding the accusers' retaliatory claims, as they had been caught parking in the teacher lot.

No witness called by the Superintendent could corroborate R██ and L██s allegations. Consequently, there is no substantive evidence that Day violated any school system policy.

The termination of Day's employment is a serious matter and would likely end his teaching career. The School Board should not take such drastic action based on the record compiled at the hearing of this matter. There is simply no just cause. The School Board should reject the Superintendent's recommendation for termination.

Sincerely,

Hon. William T. Newman, Jr.

Circuit Court Judge, Ret.

Hearing Officer

LCPS 000415